JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
DORSEY & WHITNEY LLP
305 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 857-1717
Facsimile: (650) 857-1288
Email: murray.john@dorsey.com
Email: franklin.robert@dorsey.com
Email: hwang.thomas@dorsey.com

Attorneys for Official
Committee of Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**TECHNOLOGY PROPERTIES LIMITED LLC,**<br>**fka TECHNOLOGY PROPERTIES LIMITED**<br>**INC., A CALIFORNIA CORPORATION,**<br>**fka TECHNOLOGY PROPERTIES LIMITED,**<br>**A CALIFORNIA CORPORATION,**<br><br>Debtor. | Case No. 13-51589-SLJ-11<br><br>Chapter 11<br><br>Date: *[Pending entry of order]*<br>Time: *[Pending entry of order]*<br>Place: United States Bankruptcy Court<br>280 S. First Street, Room 3099<br>San Jose, CA 95113<br>Judge: Honorable Stephen L. Johnson |

**MOTION TO TERMINATE EXCLUSIVE PERIOD TO SOLICIT ACCEPTANCES OF PLAN OF REORGANIZATION AND TO FILE A COMPETING PLAN (11 U.S.C. §1121(d))**

The Official Committee of Unsecured Creditors (the "Committee") hereby submits its MOTION TO TERMINATE EXCLUSIVE PERIOD TO SOLICIT ACCEPTANCES OF PLAN OF REORGANIZATION AND TO FILE A COMPETING PLAN (the "Motion") seeking to terminate the exclusive period of Technology Properties Limited LLC (the "Debtor" or "TPL") to seek acceptance of a Chapter 11 plan. The Motion is made on the grounds that "cause" exists to terminate exclusivity under § 1121(d) of the Bankruptcy Code because, among other things, the Debtor does not have a realistic prospect to confirm its plan of reorganization and that terminating exclusivity will facilitate the case moving forward. The Motion is based on the Notice of Hearing, the Motion

itself, the Request for Judicial Notice filed in support of the Motion, the pleadings and papers filed herein and upon such oral and documentary evidence as may be presented at the hearing on the Motion.

In support of the Motion, the Debtor respectfully represents the following:

## I. FACTUAL BACKGROUND

1. On March 20, 2013 (the "<u>Petition Date</u>"), the Debtor commenced the above-entitled Chapter 11 bankruptcy case by filing a Voluntary Petition in this Court.

2. A trustee has not been appointed for the Debtor and it continues to function as the debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3. The Committee was appointed by the Office of the United States Trustee pursuant to § 1102 of the Bankruptcy Code.

4. The exclusive periods for TPL to file a plan and obtain acceptances set forth under 11 U.S.C. §§1121(c)(2) and 1121(c)(3) were originally set to expire on July 18, 2013, and September 16, 2013, respectively. TPL and the Committee initially stipulated to extend exclusivity to file a plan and to obtain acceptances thereof to August 16, 2013, and November 16, 2013, respectively.

5. TPL and the Committee agreed to an order extending exclusivity to file a plan and to solicit acceptances to September 30, 2013 and December 5, 2013 respectively. To facilitate a mediation of the case by Judge Montali, TPL and the Committee agreed to an order extending exclusivity to file a plan and solicit acceptances to November 8, 2013 and January 7, 2014, respectively.

6. Mediation of the Parties' disputes was held on October 8 and 9, 2013. The mediation did not result in a resolution. At the status conference held in the matter on October 3, 2013, the Court indicated that any future extensions of exclusivity should be made noticed motion. Pursuant to that direction, the Debtor filed its second motion to extend exclusivity without knowing the Committee's position on further extension of exclusivity. Given the lack of progress on negotiating a plan and the Debtor's financial performance in this Chapter 11 case, the Committee informed the Debtor that it would oppose the motion and instead request termination of exclusivity so that the Committee could file its own plan. The Debtor thereupon withdrew its motion.

7. The Debtor filed its Plan and Disclosure Statement on October 31, 2013. The Debtor has set the hearing to approve the Disclosure Statement for December 5, 2013. By this Motion, the Committee requests that the Court order the presently scheduled Disclosure Statement hearing off calendar, terminate exclusivity and allow the Committee to file its own Disclosure Statement and Plan so that both Plans can proceed on parallel tracks.

## II. LEGAL AUTHORITY

8. Subsection 1121(d) provides that upon the request of a party in interest made within the 120-day period for filing a plan or within the extended 180-day period, if a plan is filed, the court "for cause," after notice and a hearing, may reduce or increase the 120-day period or the 180-day period. The determination of whether cause exists to warrant an extension or reduction of the statutory time periods is fact specific. 7 *Collier on Bankruptcy* (16th Ed) Para. 1121.06. Cause to reduce or terminate exclusivity has been found where, among other things, an extension would be fruitless, particularly in the light of previous ineffective extensions of time. It has been said that the creditors' loss of confidence in the capability of debtor's management is a factor to consider in determining cause, as is the principal parties' acrimonious relationship. *Id.*

9. Several courts have enumerated the following factors to be considered in determining whether cause exists to warrant an extension or termination: (1) the size and complexity of the case; (2) the necessity of sufficient time to negotiate and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) whether the debtor is paying its debts as they come due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiating with creditors; (7) the length of time the case has been pending; (8) whether the debtor is seeking the extension to pressure creditors; and (9) whether unresolved contingencies exist. *In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (denying extension of exclusivity period). When the court is determining whether to terminate a debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward. And that is a practical call that can override a mere toting up of the factors. *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997).

### A. The Court Should Terminate Exclusivity Based Upon A Balancing Of the Factors.

10. The case has not progressed satisfactorily. The Committee and the Debtor have been negotiating the terms of a plan for over seven months, including two sessions with Judge Montali, with no discernible progress toward a consensual plan. In the meantime, the Debtor is using this case and exclusivity to pay excessive salaries to management, pay as much as 30% of its revenues to its sister company, Alliacense LLC, (whose sole member is Dan Leckrone, who is also the sole member of the Debtor), employ administrative personnel which should be supported by Alliacense and negotiate licensing agreements at low ball values simply to obtain proceeds to operate without realizing the true value of the license.

11. The Debtor has lost over $200,000 from operations as of the September Monthly Operating Report[1], refuses to reduce its burn rate and is more focused on ensuring that Alliacense is paid at premium rates for services performed for the Debtor.[2] The Committee believes that the estate would be better served with management not burdened with the conflicts of interest existing in present management. The Committee's proposed plan would, among other things, replace current management with a team that can more effectively realize the full value of the Debtor's assets for the benefit of creditors.

12. The Committee will not address the factors used by the courts to evaluate whether exclusivity should be extended or reduced.

---

[1] In August, TPL revenue from licensing was $6,700 with expenses at $415,000; in September, revenue was $196,000 and expenses were $415,000. According to the September MOR forecast, revenue from licensing for October is projected to be $100,000, (as opposed to the $2.4 million projected in the Cash Collateral Budget); actual revenues will be closer to zero and expenses will again exceed $400,000. Given minimal, if any, revenue in October, the Committee expects losses from operations in the Chapter 11 to aggregate over $400,000 in the October report. If one includes professional fees, the Debtor will have lost over $2 million as of the October report.

[2] It is apparent that Alliacense charges a premium for its services as a means of extracting more profits for the TPL Group. For example, Alliacense charges TPL $460.00/hour for the services of attorney Ned Heller, an employee of Alliacense, at a rate below the premium rates charged to the Debtor for Mr. Heller's services. The Debtor justifies this practice by stating that it is a "for profit" entity and is entitled to do so. See Reply Brief to Application to Employ Ned Heller, p. 13 [Docket No. 260]. At the same time the Debtor employs eleven persons, including an HR and IT person, which certainly are not needed for a what is essentially a holding company and which undoubtedly perform the majority of these services for the benefit of Alliacense. Alliacense and TPL are essentially the same company. The difference is that the Debtor can funnel its revenues from one pocket to another, which is not in bankruptcy, to the detriment of the Debtor's creditors and to the ultimate benefit of Dan Leckrone, the sole member of both companies.

Factor 1 (size and complexity of the case): The case is not large or unusually complex. The Debtor has only eleven employees and approximately 80 creditors. While these creditors hold approximately $50 million in unsecured claims, approximately $37 million are held by just 8 insiders. This is a case that calls for practical solutions and sound business decisions in order for creditors to be paid 100% of their claims and allowing the Debtor to retain its equity interest. Yet, the Debtor has refused to recognize these practicalities. Instead, it continues its short sighted approach by, among other things, continuing to insist on paying management full salaries, employing eleven people, including an HR and IT personnel for what is essentially a holding company and paying premium prices to its affiliated entity Alliacense while reserving nothing for payments to unsecured creditors and insisting on proceeding with a plan that doesn't have the support of the Committee and is not confirmable.

Factor 2 (the necessity of sufficient time to negotiate and prepare adequate information): The Committee has previously stipulated on three other occasions to the extension of Exclusive Periods in the hopes that the Debtor would negotiate and propose a plan that addressed the Committee's concerns. The Committee has not been presented with such a plan and sees at this time only intransigence of the Debtor in moving substantively from any of its entrenched positions.

Factor 3 (the existence of good faith progress toward reorganization): In its Motion to Extend Exclusivity (since withdrawn), the Debtor asserted that it has made progress in the case by issuing licenses and settling litigation for millions of dollars. The Debtor has in actuality failed to meet its cash collateral revenue projections by over $3 million. Further, the proceeds from these settlements have not resulted in net proceeds for the estate due to the necessity of having to pay contingency counsel (to which the Committee does not object) and the massive payments to Alliacense (to which the Committee does object). The Debtor further stated that progress had been made in the case in that it has "obtained" stay relief in two litigation cases and concluded its trial before the ITC and the Northern District of California. The stays were obtained through stipulations with the counter parties. The Debtor actually received an unfavorable award before the ITC and although infringement was found by the jury in the District Court, it awarded only one-tenth of the damages the Debtor requested in the case.

Factor 4 (whether the debtor is paying its debts as they come due):  While the Debtor is certainly paying Alliacense, it has been unable to make payments required under the cash collateral order consisting of the carve-outs to the Committee's and the Debtor's professionals.  As of the September Monthly Operating Report, the beginning cash balance was $308,000 and estimated expenses totaled $421,000.  Projected revenue for the month was $83,000.

Factor 5 (whether the debtor has demonstrated reasonable prospects for filing a viable plan):  The Debtor has not shown any reasonable prospect for filing a viable plan that would be confirmable over the objection of the Committee.  Debtor has submitted a plan which is unacceptable to the Committee and which evidences the Debtor's inability to recognize the realities and purposes of Chapter 11.  The Debtor's proposed plan cannot be confirmed because it fails to satisfy numerous requirements of Bankruptcy Code Section 1129.  The specific objections will be set forth in the opposition to the Disclosure Statement that will be filed by the Committee in the next week.  These objections will include:

    a.    The plan does not comply with the applicable provisions of Chapter 1, including, but not limited to, misclassification of creditors, artificial impairment of creditors, uncertain Effective Date.

    b.    The plan is not proposed in good faith.

    c.    The plan is not feasible on its face.  The Debtor's gross revenues in 2010 were approximately $17,600,000 and for each of 2011 and 2012 approximated $10,000,000.  During the pendency of this case, total receipts have averaged less than $1 million monthly.  To establish the feasibility of its plan, the Debtor projects income of $30,300,000 in 2014, $40,600,000 in 2015 and $47,900,000 in 2016.  The Debtor offers no plausible explanation regarding the dramatic increase in revenues.  Further, given its present cash balance, the Debtor cannot demonstrate that it can make those payments due on the effective date of the plan if the "effective date" is appropriately defined. The Debtor has not demonstrated its ability to cure defaults for contracts it wishes to assume (which would give rise to administrative expense claims that must be paid upon the effective date unless otherwise agreed) or calculated and provided for rejection damages for contracts it wishes to reject (which would give rise to additional unsecured claims in Class 6).

    d.    The plan is not fair and equitable:
        i.    The proposed effective date is fixed at the discretion of the Debtor and can be pushed out as far as July of 2014.
        ii.    Without subordination of insider, senior management and family

claims, the Debtor will be unable to make all payments to creditors under the plan, or at best would stretch payments to unsecured creditors over decades.

iii. Misclassification of claims.

e. The plan unfairly discriminates.

Factor 6 (whether the debtor has made progress in negotiating with creditors): The Debtor has not made progress in this regard. The parties have been negotiating over the past seven months with no results. While negotiations have recently been renewed, it is unclear as to whether the Debtor will respond positively.

Factor 7 (the length of time the case has been pending): This case has been pending for over seven months. The Debtor has incurred significant expenses and has not made a profit. Worse, the Debtor's management has been unable to recognize the realities of its financial performance; revenues have not been what were projected and the Debtor is simply treading water in order to pay excessive salaries to its management and pay inflated and premium prices to its affiliated Company at the expense of the estate. The estate simply cannot afford any further low ball settlements of infringement claims achieved solely to keep the Debtor and Alliacense in business since these settlements dissipate the estate's assets while leaving nothing for unsecured creditors.

The Monthly Operating Reports show that the Debtor has lost money from operations in every month save one. The profit from June has long since been dissipated by the losses in every other month.[3] The payment of proceeds from licensing transactions for excessive salaries and non-essential personnel and to Alliacense will continue to drain the estate and inures only to the benefit of the Debtor and its insiders to the detriment of the creditors. The passage of time only serves to benefit the Debtor's insiders and affiliated companies.

**a) Employee Salaries - Management[4]**

Dan Leckrone is paid $480,000 a year and seeks to be paid $160,000 during the cash collateral period as CEO of the Debtor. This salary is grossly excessive considering the Debtor's

---

[3] The September report showing cumulative losses from operations of $151,605 is incorrect. It is actually over $200,000.

[4] Information regarding salaries is set forth in the Supplemental Declaration of Dwayne Hannah In Support Of Second Motion For Use Of Cash Collateral filed on October 30, 2013. [Docket No. 255]

RAF:sb
H:\Client Matters\- F&R\Tech Properties\Pl\Exclusivity\MotTerminate\v4.docx
7
MOTION TO TERMINATE EXCLUSIVE PERIOD TO SOLICIT ACCEPTANCES OF PLAN OF REORGANIZATION AND TO FILE A COMPETING PLAN

Case: 13-51589    Doc# 269    Filed: 11/21/13    Entered: 11/21/13 16:15:15    Page 7 of 11

financial performance in this Chapter 11 case and in light of TPL's status as a holding company. The Committee believes that it is simply irresponsible that Mr. Leckrone continues to insist that he be paid this salary.

Dwayne Hannah and Susan Leckrone Anhalt are the Debtor's Chief Financial Officer and Legal Counsel respectively. On information and belief, Mr. Hannah and Ms. Anhalt perform work for Mr. Leckrone's other entities, including Alliacense. Such work should not be paid by the Debtor, especially considering the premium charged by Alliacense to TPL for its services. Janet Neal is responsible for "organizing, scheduling, preparing and following-up on all activities of the Office of the Chairman…". For what is essentially an administrative assistant position, she is being paid $250,000 annually.

### b) Other employees

The employee roster for this 11 person company includes an HR person at $92,000 per year, an IT person at $114,000 per year; a "Director of Tax" at $150,000 per year; an executive assistant at $82,000 per year; an unidentified person as a "Misc. Consultant" at $48,000 per year; and a "Chief IP Counsel" at $97,000 per year. The Debtor does not explain why it needs an "HR" person or an IT person for what is essentially a holding company. Nor does there appear to be a need for a Director of Tax when Mr. Hannah, as the CFO, should be handling these matters. Undoubtedly, most of these personnel are performing services to Alliacense and for which the Debtor is not being reimbursed.

### c) Payments to Alliacense

13. According to the Alliacense Services Agreement, Alliacense receives a contingency fee based upon non-MMP licensing revenue[5]. It is also paid its litigation costs for services provided on an hourly basis to assist the contingent fee attorneys in conducting litigation in the ITC and federal district court. As noted in footnote 2 above, the Committee believes that Alliacense charges a premium to TPL for these services inasmuch as Alliacense's employees are paid a salary which is lower than the amounts charged hourly by Alliacense to TPL. This represents yet another drain on

---

[5] MMP refers to the Moore Microprocessor Portfolio which is owned jointly by Patriot and the Debtor and which is administered by PDS. PDS pays a contingency fee and litigation support services fee directly to Alliacense before making distributions to Patriot and the Debtor.

the Debtor and its creditors and more money to the TPL Group and Dan Leckrone as sole member of Alliacense.  In the proposed Cash Collateral budget filed by TPL, assuming the projected revenue were to come in, Alliacense would receive 32.1% of gross revenue for November, 32.5% for December, 30.9% for January, 2014 and 30.3% for February.  Time is not on the side of the creditors in this case; it only serves to benefit the Debtor and its insiders.

<u>Factor 8</u> (whether the debtor is seeking the extension to pressure creditors):  The Debtor has stridently explained to the Committee its belief that failure of the Committee to unite behind the Debtor and filing motions or oppositions will lead potential licensees to resist efforts to complete licenses in the belief and hope that the Debtor will not survive the Chapter 11.  The Committee believes that reasoning is false.  The Committee has been very circumspect in its filings and has allowed the Debtor to operate in order for the Debtor to seek agreement on a consensual plan.  The Debtor's recent inability to consummate licenses is certainly not the product of anything the Committee has said or done in this case.

14. The Committee continues to believe that the Debtor has valuable assets which can and should be commercialized, but is now convinced that current management is not able to realize these true values.  Indeed, the Committee believes that potential licensees will be more likely to negotiate with a new team than with existing management.  The Committee believes it is imperative to replace management as soon as possible so as to allow the Debtor to operate profitably and repay its creditors.  The Debtor should not be allowed to continue exclusivity as a means of pressuring creditors into consent of an unacceptable plan while it continues to accept the protections of the Bankruptcy Code and allow the Debtor to continue to funnel money to its sister company, Alliacense, at the expense of unsecured creditors.

<u>Factor 9</u> (whether unresolved contingencies exist):  The Committee is unaware of any unresolved contingencies justifying continued exclusivity.

**B. The Committee Has Lost Confidence In the Ability Of Debtor's Management And Termination Of Exclusivity Will Allow The Case To Move Forward**

15. The Committee has lost confidence in the Debtor's management. The inability of the Debtor to recognize its financial position and refusal to reduce expenses point to a lack of

RAF:sb
H:\Client Matters\- F&R\Tech Properties\Pl\Exclusivity\MotTerminate\v4.docx

9

MOTION TO TERMINATE EXCLUSIVE PERIOD TO SOLICIT ACCEPTANCES OF PLAN OF REORGANIZATION AND TO FILE A COMPETING PLAN

Case: 13-51589    Doc# 269    Filed: 11/21/13    Entered: 11/21/13 16:15:15    Page 9 of 11

understanding the realities the Debtor presently face. The Debtor has not paid many of its creditors for many years. The Committee has little confidence it will do so under the plan absent adoption of the positions taken by the Committee in the negotiations. One of the most important reasons for extending the debtor's period of exclusivity is to give the Chapter 11 process of negotiation and compromise an opportunity to be fulfilled, so that a consensual plan can be proposed and confirmed without opposition. See *Southwest Oil Co.*, 84 B.R. 448, 452 (Bankr. W.D. Tex 1987). The Committee and the Debtor have engaged in negotiations over seven months without success.

> One of the reasons that the debtor and its major secured creditors have not been able to find common ground upon which to build a plan of reorganization is that these creditors have lost faith in the capability and perhaps the integrity of debtor's management. In extreme cases, such a loss of faith may constitute cause for the appointment of a trustee. See *In re Cardinal Industries, Inc*., 109 Bankr. 755, 765-66 (Bankr. S.D. Ohio 1990). While the court makes no finding as to whether or not this loss of faith is justified (indeed the nature of the hearing and the evidence presented do not permit the court to determine this question) for the purposes of the present motion, it is only necessary to realize that a loss of confidence exists. This is a factor the court should and must consider in its determination.

*In re All Seasons Industries, Inc*., 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990

### C. The Court Should Take The Presently Scheduled Disclosure Statement Hearing Off Calendar So That The Committee's Plan and the Debtor's Plan Can Proceed On Parallel Tracks

16. The Committee submits that the Debtor's failure to reach agreement with the Committee regarding a consensual Chapter 11 plan and insistence on pursing a patently unconfirmable plan constitute misuse of the Exclusivity Periods and provide cause for termination of exclusivity, rather than an extension of the Exclusive Periods. The interest of the creditors and the estate would best be served by denying extension of exclusivity and permitting the Committee to file an alternative plan that can be confirmed.

17. To effectively move the case forward, the Committee submits that the Court should order that the competing plans proceed on parallel tracks. The Committee is commencing preparation of its own plan and disclosure statement and will be prepared to set times within which the plan and disclosure statement be filed should the Motion be granted.

### III. CONCLUSION

The factors all favor termination of exclusivity in this case. Terminating exclusivity will also allow the case to move forward instead of having the case bogged down by the Debtor trying to confirm a plan over the objections of the Committee. Based on the foregoing, the Committee respectfully request that the Court enter its order;

1. Granting the Motion;

2. Taking the Disclosure Statement hearing presently scheduled for December 5, 2013 off calendar; and

3. Granting such other and further relief as is just and appropriate.

Dated: November 21, 2013              DORSEY & WHITNEY, LLP

                                      By: /s/ Robert A. Franklin
                                          Robert A. Franklin
                                          Attorneys for the
                                          Official Unsecured Creditors Committee