HEINZ BINDER (SBN 87908)
ROBERT G. HARRIS (SBN 124678)
WENDY W. SMITH (SBN 133887))
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
Tel: (408) 295-1700
Fax: (408) 295-1531
Email: Heinz@bindermalter.com
Email: Rob@bindermalter.com
Email: Wendy@bindermalter.com

Attorneys for Debtor and Debtor-in-Possession
TECHNOLOGY PROPERTIES LIMITED LLC


STEPHEN T. O'NEILL (115132)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
DORSEY & WHITNEY LLP
305 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 857-1717
Facsimile: (650) 857-1288
Email: oneill.stephen@dorsey.com
Email: franklin.robert@dorsey.com
Email: hwang.thomas@dorsey.com

Attorneys for Official
Committee of Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>TECHNOLOGY PROPERTIES LIMITED LLC, a California limited liability company,<br><br>Debtor. | Case No.: 13-51589SLJ<br><br>Chapter 11<br><br>CONFIRMATION HEARING<br>Date: February 11, 2015<br>Time: 10:00 a.m.<br>Place: Courtroom 3099<br>       280 South First Street<br>       San Jose, California |

JOINT DISCLOSURE STATEMENT (JANUARY 8, 2015)



**DISCLOSURE STATEMENT RE: JOINT PLAN OF REORGANIZATION BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND DEBTOR (January 8, 2015)**

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 1

   A.     General ............................................................................................................... 1

   B.     Executive Summary of Plan.............................................................................. 1

   C.     Voting ................................................................................................................ 3

      1.   How to Vote. ................................................................................................. 3

      2.   Number and Amount of Votes Required To Confirm Plan. .......................... 3

II. HISTORY OF TPL ............................................................................................................ 4

   A.     TPL's Founding, Business, and Litigation ...................................................... 4

   B.     Infringement Litigation .................................................................................... 6

      1.   Overview of Litigation. ................................................................................ 6

      2.   MMP Patent Litigation. ................................................................................ 9

      3.   CORE Flash Litigation. .............................................................................. 11

      a.   The CORE Flash II District Court Cases. (See Exhibit "A" for Case Identification).... 11

      c.   The CORE Flash I ITC and District Court Cases. *(See Exhibit "A" for Case Identification)* ............................................................................................. 11

      d.   2011 American Inventors Act Post-Grant Review........................................ 12

      4.   Fast Logic Litigation.  (See Exhibit "A" for Case Identification) ................. 13

   C.     Other Litigation............................................................................................... 15

      1.   Chester A. Brown, Jr. and Marcie Brown v. TPL et al. ............................... 15

      2.   Charles Moore v. TPL et al. ........................................................................ 16

3.     Future Litigation.................................................................................... 17

D.    Factors and Events Leading to Bankruptcy Filing.......................................... 17

E.    Retention of New CEO. ............................................................................ 18

III.  TPL'S DEBT AND ASSET STRUCTURE ......................................................... 20

A.    Secured Debt ........................................................................................... 20

1.     CCC. ....................................................................................................... 20

2.     Leckrone. ................................................................................................. 21

3.     Venkidu. .................................................................................................. 21

4.     Lien Priorities. ......................................................................................... 22

B.    Priority Claims ........................................................................................ 23

C.    General Unsecured Claims ........................................................................ 23

D.    Investor Claims - Disputed ....................................................................... 24

E.    Assets of the Debtor ................................................................................. 26

IV.  POST BANKRUPTCY EVENTS ...................................................................... 27

V.  SUMMARY OF PLAN OF REORGANIZATION............................................... 29

A.    Plan Type: Reorganization........................................................................ 29

B.    Classes Of Claims and Treatment Thereof ................................................. 29

C.    Means of Execution of Plan ...................................................................... 37

D.    Notice Procedure..................................................................................... 48

E.    Post-Confirmation Fees and Reports. ........................................................ 49

F.    Final Decree. .......................................................................................... 49

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 4 of 104

G.  Executory Contracts ..................................................................... 50

H.  Default Under Plan. .................................................................... 51

VI. DISCLOSURES & ANALYSIS OF TREATMENT OF EXECUTORY CONTRACTS .... 53

A.  Commercialization Agreements with Historical Background ....................................... 53

1.  MMP – Charles Moore, Patriot Scientific Corporation and Phoenix Digital Solutions LLC. ........................................................................................ 55

2.  Commercialization Agreements with Other Unrelated Parties. ...................................... 59

3.  Commercialization Agreements with Related Parties. .............................................. 59

B.  Service Agreements Relating to Commercialization ................................................ 70

1.  Amended Services Agreement with Alliacense Limited LLC. ...................................... 70

C.  Employee Compensation Contracts .............................................................. 70

D.  Business Vendors ............................................................................. 72

E . Agreements Relating to Assignment of TPL Seat On PDS Board of Director To Committee Representative. ........................................................................ 72

F.  Scope and Intent of Article XIV. ............................................................... 73

G.  Confirmation Order. .......................................................................... 74

H.  Amendments to Article XIV. ................................................................... 74

I.  No Adverse Impact On Licenses. ................................................................ 74

J.  No Change For Patent Actions. ................................................................. 75

K.  Reserved Objections. ......................................................................... 75

L.  IP Owner Side Letters. ........................................................................ 76

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 5 of 104

VII.  ALTERNATIVES TO THE PLAN. ................................................................................. 76

    A.      General ................................................................................................................ 76

    B.      Best Interest of Creditors .................................................................................... 76

    C.      Liquidation under Chapter 7 ............................................................................... 76

    **D.**     Liquidation Analysis Applied .............................................................................. 78

        1.      Assets. ............................................................................................................ 78

        2.      Avoidance Actions. ....................................................................................... 79

        3.      Costs. ............................................................................................................. 80

        4.      Claims: .......................................................................................................... 81

VIII.  FEASIBILITY ................................................................................................................ 82

    A.      General ................................................................................................................ 82

    B.      Strategic Overview .............................................................................................. 82

    C.      Assumptions Related to Forecasts. ...................................................................... 85

        1.      Foundational Assumptions. ........................................................................... 85

        2.      MMP Assumptions ........................................................................................ 86

        3.      CORE Flash Assumptions ............................................................................ 87

        4.      Fast Logic Assumptions. ............................................................................... 88

        5.      Certain Cost Assumptions. ........................................................................... 89

    D.      Other Considerations .......................................................................................... 89

        1.      Accounting Basis ........................................................................................... 89

        2.      Summary of TPL's Operating Results Post-Bankruptcy ............................... 90

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 6 of 104

3.  Summary of Historical Operations and Revenues ........................................... 90

4.  Risks. ............................................................................................................. 91

IX. DISCLOSURE OF POST-CONFIRMATION MANAGEMENT ........................................ 92

X. FEDERAL INCOME TAX CONSEQUENCES OF PLAN FOR CREDITORS ................... 93

XI. CONCLUSION.................................................................................................................. 96

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 7 of
104

# I.  INTRODUCTION

**A.       General**

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125 FOR SOLICITATION OF ACCEPTANCES THEREOF.  DISTRIBUTION OF THIS DISCLOSURE STATEMENT TO CREDITORS IS AUTHORIZED BY THE ENCLOSED ORDER OF THE UNITED STATES BANKRUPTCY COURT DATED JANUARY 8, 2015.

**B.       Executive Summary of Plan**

The JOINT PLAN OF REORGANIZATION BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND DEBTOR (DATED JANUARY 8, 2015) (the "<u>Plan</u>")[1] sets forth the joint proposal of the Committee and TPL under which TPL will operate under new management overseen by the Committee and pay its creditors quarterly for a period of no more than seven years after its Effective Date to achieve full payment of all Allowed Claims.  Such Quarterly Payment shall be comprised of 100% of TPL's share of the distribution of MMP Portfolio proceeds from PDS and 80% of proceeds from the Core Flash and Fast Logic Portfolios, less operational and administrative costs. TPL will continue to commercialize its CORE Flash and Fast Logic portfolios, but licenses will, after Confirmation, be written by the IP Owners of the portfolios to whom the licenses will be reconveyed as of the Effective Date.

**Creditors will receive the treatment set forth in Articles III, IV and V of the Plan which are summarized below at Section V-B.; if you are uncertain in which class your claim is treated, please refer to Exhibit "D-1" hereto which lists all Claims filed and**

---

[1] All capitalized terms in this Disclosure Statement, unless defined herein, shall have the definitions set forth in the Plan.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 8 of 104

scheduled and the amount for each.

Please take notice that Section VII.E. of the Plan, titled "Release of Claims" provides that Confirmation of the Plan shall constitute and effect a full release of all Avoidance Actions, claims, causes of action and claims for relief[2] against the Released Parties who vote to accept the Plan which, among other things, provides for subordination of the Claims of the Released Parties, whether or not any of the Released Parties[3] execute the Release except that, as to Daniel E. Leckrone, if the Bankruptcy Case is converted to Chapter 7 after Confirmation, the release of claims shall be undone automatically, as shall any subordination of Claims or liens held by Leckrone, without further order of the Bankruptcy Court. The Chapter 7 trustee shall have the ability to pursue all claims against Leckrone, and the statute of limitations set forth in 11 U.S.C. § 546 shall be tolled and will not expire until one (1) year after the appointment of the Chapter 7 Trustee. The aforementioned releases are pursuant to a compromise of controversy under which each party receiving a release has agreed to subordinate his, her, or its Claims in the Bankruptcy Case to the holders of Allowed Claims in Classes 1 through 6C. Confirmation also effects a mutual release of the Released Claims[4] of the Estate and Reorganized Company as to all parties who execute the Release in substantially the form attached to the Plan as Exhibit "E".

---

[2] Exhibit "F" hereto is a list of potential actions that Charles Moore, a holder of a contingent, Disputed Claim that TPL believes should be disallowed in entirety, has alleged during the Bankruptcy Case could be brought and which are all included in the Released Claims.

[3] "**Released Parties**" means the following persons: Dwayne Hannah, Mike Davis, Robert Neilson, Susan Anhalt, Daniel ("Mac") McNary Leckrone, Daniel E. Leckrone, Janet Neal, Nick Antonopoulos, Interconnect Portfolio, John Leckrone, Alliacense, Eric Saunders, Michael Montvelishsky, William Martin, and any and all entities wholly-owned or partially owned by Leckrone, the Leckrone Family Trust including HSM, MCM, VNS Portfolio LLC, and any predecessor or successor thereto.

[4] "**Released Claims**" means any claims or causes of actions against the Released Parties by the Debtor, the estate, and all persons and entities that vote to accept the Plan and execute the Release, and any claims or causes of actions against the Reorganized Company except as provided herein.

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 9 of 104

C.    <u>Voting</u>

1.    <u>How to Vote.</u>

A vote for acceptance or rejection of the Plan may be cast by completing and signing the ballot enclosed herewith and mailing it to Binder & Malter, 2775 Park Avenue, Santa Clara, CA 95050, to the attention of Robert G. Harris, Esq., in an envelope marked "TPL Ballot" in the lower left hand corner.  <u>Only the Ballot should be mailed</u>.  For your vote to be counted, your completed ballot must be received no later than February 4, 2015, by 5:00 p.m., Prevailing Pacific Time.  Upon its Confirmation, the Plan will be binding on all creditors regardless of whether a creditor has voted in favor of or rejected the Plan.

2.    <u>Number and Amount of Votes Required To Confirm Plan</u>.

The Bankruptcy Code provides as follows with respect to the voting on the Plan: Any class voting to accept must do so with votes of claimants holding Allowed Claims totaling at least two-thirds in amount and more than half in number of Allowed Claims in any particular class (11 U.S.C. § 1126(c));

-    At least one impaired class must vote to accept the Plan without including the acceptance of the Plan by any insider (11 U.S.C. § 1129(a)(10)); and

-    Each class must vote to accept the Plan or not be impaired (11 U.S.C. § 1129(a)(8)) or the Plan is confirmed notwithstanding the accepting vote of one or more impaired classes pursuant to 11 U.S.C.§ 1129(b) if the Bankruptcy Court finds that it does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired under and has not accepted the Plan.

<u>Class 2</u>, <u>Class 3</u>, <u>Class 4</u>, <u>Class 5</u>, <u>Class 6A</u>, <u>Class 6B</u>, <u>Class 6C</u> and <u>Class 7</u> are impaired by the Plan. Creditors who cast dissenting votes in any of these classes are further protected by

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 10 of 104

Bankruptcy Code Section 1129(a)(7)(A)(ii), which specifies that each dissenting creditor will receive or retain on account of its claim property of a value, as of the Effective Date, that is not less than the amount that the holder would receive or retain were TPL liquidated under Chapter 7 on the Effective Date.

## II.  HISTORY OF TPL

**A.  TPL's Founding, Business, and Litigation**

TPL was founded in 1988 by Daniel E. Leckrone, to develop, manage, take to market, and license proprietary products and technology, a process referred to generally as "commercialization." In 1989, TPL participated in developing and began the commercialization of a remarkable microprocessor device and technology that has come to be known as the MMP Portfolio named after its inventor Charles H. Moore. The technology is widely recognized as a fundamental building block of all microprocessor-based products in existence today.[5]

TPL also commercializes several other products, technologies, and portfolios of patents ("Portfolios"), including, among others, the Fast Logic Portfolio which relates to high-speed logic circuits and the CORE Flash Portfolio which relates to flash-media cards. Since 2004, TPL has licensed Portfolios to all segments of the digital electronics industry, from aerospace and defense to computer gaming. Its customer base has included major multinational corporations recognized for their worldwide involvement in consumer electronics and computer-related products. The business is very competitive and subject to changing economic conditions. It has

---

[5] To settle disputes regarding ownership of elements of the MMP Portfolio, TPL entered into a joint venture with Patriot Scientific Corporation ("Patriot") named Phoenix Digital Solutions LLC ("PDS") to unify the ownership of the MMP Portfolio. Initially, PDS engaged TPL on an exclusive basis to manage the commercialization of the MMP Portfolio, including all licensing efforts and litigation. Because of subsequent conflicts, that arrangement was changed in 2012 and TPL still manages the litigation, but TPL no longer licenses the MMP Portfolio itself. PDS alone issues licenses of the MMP Portfolio. The agreements related to the MMP Portfolio are discussed in greater detail below at section VI-A-1.

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 11 of 104

also been impacted by judicial and legislative efforts to weaken certain intellectual-property rights to the disadvantage of small technology-based companies and individual inventors.

Although it is a smaller part of its business, TPL also develops products based on the technologies protected by the Portfolios, including the development of a revolutionary microprocessor called SEAforth. SEAforth was developed by Mr. Moore with a team of engineers involved in TPL's chip-product business, IntellaSys, a division of TPL. The SEAforth microprocessor has yet to gain commercial acceptance, but it remains an important asset of TPL.

In conjunction with its development of the SEAforth Microprocessor and various SEAforth product applications since 2006, TPL expanded its efforts to develop and fund technologies towards the development of a hearing device which utilizes as its processing platform the SEAforth Microprocessor in conjunction with proprietary signal processing algorithms. The device has been successfully prototyped and is ready to be taken to market as soon as either internal or external funding becomes available.

TPL's primary business -- maximizing the value of its Portfolios and related products -- has three primary components. First, TPL has entered into a series of agreements with Portfolio owners pursuant to which TPL manages the commercialization of a Portfolio of patents and its products in exchange for a share of the revenue or, in some cases, payment for the service and expenses.

Next, TPL identifies companies whose products utilize the technology protected by the patents and works to license to those companies the right to use the technology. This requires technical analysis for which the Debtor outsources to Alliacense Limited LLC ("Alliacense")[6] to provide such analysis and related licensing services. As discussed below at section VI-A-1, in

---

[6] TPL and Alliacense are both owned by Mr. Leckrone, and the President of Alliacense is Daniel MacNary ("Mac") Leckrone, Mr. Leckrone's oldest son.

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 12 of 104

conjunction with the Plan, licensing services with respect the MMP Portfolio will be allocated between another entity and Alliacense.

If licensing efforts are unsuccessful, the third component is to prosecute litigation against infringing companies who refuse to either stop using the patented technology or purchase the right to continue using it. Throughout the litigation process, licenses continue to be marketed to defendants. Once a license is successfully negotiated it resolves the issues in the outstanding litigation, and the litigation is dismissed.[7]

**B.** **Infringement Litigation**

    1.    Overview of Litigation.

TPL is currently litigating infringement claims in the United States International Trade Commission (the "ITC" or "Commission") and various United States District Courts involving approximately 30 separate actions against dozens of Defendants and Respondents involving the MMP Portfolio, the CORE Flash Portfolio and the Fast Logic Portfolio ("Patent Actions"). Complaints have been filed in the ITC and the U.S. District Courts for the Eastern District of Texas, the District of Delaware and the Northern District of California. In many of those actions the patent owners are named parties together with TPL. A detailed list of all of the pending Patent Actions and their status is attached as Exhibit "A" and they will be discussed here according to the name assigned to them in Exhibit "A".

The legal basis for these cases is substantively the same across all filings, differing as to the identity of the infringer, the infringing products, and the particular patents at issue. In each case that is brought in a United States District Court, TPL has claimed, in either its complaint or in a cross-complaint, that the defendants' products have infringed, and continue to infringe, the

---

[7] In the case of the MMP Portfolio, TPL does not control the licensing of the Portfolio, and thus does not control whether litigation is settled. Once PDS licenses the MMP Portfolio to a defendant, the legal action becomes moot, and TPL as nominal plaintiff must dismiss it.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 13 of 104

identified patents. TPL's actions seek damages for the infringement, injunctive relief, and attorneys' fees. Where TPL is named as defendant, the plaintiff is seeking a determination that its products do *not* infringe and/or that the patents are invalid, and TPL will have a cross-claim asserting that the products do infringe and the patents are valid, if applicable.

The actions brought before the ITC request an investigation regarding the respondents' importation into the United States of certain products which infringe certain patents in violation of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"). This law prohibits such importation as an unfair trade practice, and provides for the ITC to enter an "Exclusion Order" against the importing parties, when such importation is found to harm a domestic industry in the United States. The actions seek only injunctive relief in the form of such an Exclusion Order. While an ITC case is pending, the corresponding action in District Court is stayed pending the outcome of the ITC proceeding.

In those cases where either a trial or determinative Markman hearing[8] is pending or has occurred, TPL expects that the likelihood of outcomes favorable to TPL may encourage settlement by defendants, which contributes to funding the Plan.

---

[8]A Markman hearing is a pretrial hearing in which a judge examines evidence from all parties on the appropriate meanings of relevant key words used in a patent claim. It is also known as a "Claim Construction Hearing."

Holding a Markman hearing in patent infringement cases has been common practice since the U.S. Supreme Court, in the 1996 case of *Markman v. Westview Instruments, Inc.*, found that the language of a patent is a matter of law for a judge to decide, not a matter of fact for a jury to decide.

Markman hearings are important, since the court determines patent infringement cases by the interpretation of claims. A Markman hearing may encourage settlement, since the judge's claim construction finding can indicate a likely outcome for the patent infringement case as a whole. Markman hearings are before a judge, and generally take place before trial. A Markman hearing is not a required part of an ITC proceeding, and it is at the discretion of the administrative law judge ("ALJ") whether one is needed and when it should occur.

Two of the Fast Logic Litigation[9] defendants, SanDisk and STMicroelectronics (the "Fast Logic Defendants"), disagree with the Debtor and contend that the Claim Construction Order issued by the Delaware District Court on June 17, 2014, considered and expressly rejected the Debtor's proposed construction of multiple critical claim terms and instead adopted many of the Fast Logic Defendants' proposed constructions and significantly narrowed the scope of the asserted claims. Accordingly, the Fast Logic Defendants assert that the Delaware District Court has foreshadowed the eventual outcome of the Fast Logic Litigation – that the Debtor does not have any viable infringement claims and that pursuit of the Fast Logic Litigation is a detriment to the Debtor's creditors as it results in payment of out-of-pocket expenses related to the Fast Logic Litigation and could result in the Debtor having to pay Fast Logic Defendants' legal expenses as discussed in further detail herein.

TPL strongly disagrees with the suggestion that the Defendants "won" the *Markman* claim construction hearing. The fact that the Delaware District Court denied the requests of STMicro for summary judgments based on the *Markman* ruling, and the fact that other defendants withdrew similar requests, belies the argument that Plaintiffs TPL and HSM Portfolio, LLC cannot as a matter of law meet the requirements of the claim construction rulings.

Conversely, delays resulting from a prolonged trial, appeals, or proceedings in the Bankruptcy Case may discourage prompt settlements and impede the ability to pay creditors. TPL has had excellent results to date in the Patent Actions and anticipates that the current Actions will result in favorable outcomes. The Fast Logic Defendants contend that TPL has had poor results to date in the Fast Logic Litigation and further maintain that such results will lead to a dismissal of the Fast Logic Litigation. TPL notes that both ST Micro and SanDisk have now entered into settlements with TPL in the Fast Logic Litigation.

---

[9]The Fast Logic Litigation is discussed below at Section II-B-4.

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 15 of 104

2.    MMP Patent Litigation.

Within the MMP Portfolio, there are five U.S. patents, one European patent, and one Japanese patent that are widely infringed by electronics products -- including automotive, aerospace and medical products to computers and everyday electronics products -- and licensed to over 110 companies worldwide.

One of those patents -- U.S. Patent No. 5,809,336 (''the '336 patent'') -- has recently been the subject of activity in the ITC, and in the U.S. District Court in the district of Northern California ("NorCal").

A complaint was filed with the ITC on July 24, 2012, under section 337 of the Tariff Act of 1930, on behalf of TPL, PDS, and Patriot.  The complaint alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain wireless consumer electronics devices and components thereof by reason of infringement of certain claims of the '336 patent) . The complaint further alleges that an industry in the United States exists as required by subsection (a)(2) of section 337 of the Tariff Act of 1930.

The complainants requested that the Commission institute an investigation and, after the investigation, issue an exclusion order and cease and desist orders against the following companies:  Acer Inc., Acer America Corporation, Amazon.com, Inc., Barnes & Noble, Inc., Garmin Ltd., Garmin International, Inc., Garmin USA, Inc., HTC Corporation, HTC America, Huawei Technologies Co., Ltd., Huawei North America, Kyocera Corporation, Kyocera Communications, LG Electronics, Inc., LG Electronics U.S.A., Nintendo Co., Ltd., Nintendo of America, Novatel Wireless, Inc., Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Sierra Wireless, Inc., Sierra Wireless America, Inc., and ZTE Corporation, ZTE (USA) Inc..

Having considered the complaint, the ITC, on August 20, 2012, ordered that— (1) Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, an investigation be instituted

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 16 of
104

to determine whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain wireless consumer electronics devices and components thereof that infringe one or more of claims 1, 6, 7, 9–11, and 13–16 of the '336 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337.   Subsequently, respondents Acer, Kyocera and Sierra Wireless purchased comprehensive licenses under the '336 patent.

There was a trial at the ITC in June 2013 at which none of the respondents contested the validity of the '336 patent.  On September 6, 2013, ALJ Gildea issued an Initial Determination finding the requisite domestic industry but no violation of section 337 due to no infringement of any of the claims of the '336 patent.

One month later, there was a trial in the patent infringement litigation between TPL and HTC that had been ongoing since 2008.  Following a trial which included the detailed testimony of technical experts the San Jose jury found infringement of six claims of the '336 patent.  In so doing, the jury rejected HTC's argument that its use of an external oscillator negated its infringement.

The ITC reviewed the ALJ's Initial Determination of no infringement and affirmed, finding no violation of section 337.  Following the NorCal jury verdict, the district-court cases will now proceed against the former ITC respondents in the Northern District of California to address infringement and damages with respect to each of the remaining ITC respondents.  TPL's assumptions as to the impact of these results on its licensing programs is set forth below.

3.      CORE Flash Litigation.

a.      The CORE Flash II District Court Cases. (See Exhibit "A" for Case Identification)

In March 2012 in conjunction with the filing of the CORE Flash II ITC case, TPL and others filed Complaints against the same companies in the CORE Flash II ITC case in the United States District Court for the Eastern District of Texas for patent infringement seeking a determination that the identified products of the named Defendants infringe the identified CORE Flash patents, as well as damages for past infringement and an injunction prohibiting the future importation and/or sale of the products in the United States. The District Court cases were stayed pending the outcome of the CORE Flash II ITC case.  After the CORE Flash II ITC case concluded, the stays were lifted.  The Defendants collectively filed a motion to transfer each of the CORE Flash II district court cases to the United States District Court for the Northern District of California which was granted on July 14, 2014.

b.      The CORE Flash I ITC and District Court Cases. (See Exhibit "A" for Case Identification)

In August 2011 in conjunction with the filing of the first CORE Flash ITC case, TPL and others filed a Complaint against 19 different companies) in the United States District Court for the Eastern District of Texas for patent infringement seeking a determination that the identified products of the named Defendants infringe the identified CORE Flash patents, as well as damages for past infringement and an injunction prohibiting the future importation and/or sale of the products in the United States.  The CORE Flash I ITC Case resulted in multiple Exclusion Orders.  Several of the Defendants settled, and several filed bankruptcy, leaving six Defendants in the District Court action.  On the Motion of the Defendants, the CORE Flash I District Court case had been stayed pending the outcome of the CORE Flash I ITC case. Now that the ITC

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 18 of 104

Case is complete, the District Court action may proceed. TPL has determined that, of the six remaining defendants, only one will be pursued and is in the process of dismissing the remaining defendants. This dismissal is without prejudice to renewing an action if a dismissed defendant begins more significant infringement activity.

        c.       <u>2011 American Inventors Act Post-Grant Review</u>.

        In March 2013, Hewlett-Packard Company ("HP") petitioned the United States Patent and Trademark Office ("USPTO") to institute a new form of post-grant review created by the 2011 America Invents Act known as an "Inter Partes Review" and assigned Case No. IPR2013-00217. The petition was granted and a trial will be ordered to adjudge the validity of claims 7, 11, 19 and 21 of US 7,162,549 (the "'549 patent").

        Following trial in the IPR proceeding on 6/4/14, the Patent and Trademark Appeals Board (the "Board") issued its final decision ("the IPR Judgment") on August 6, 2014 against TPL. TPL filed a notice of appeal from the IPR Judgment, seeking review by the Federal Circuit Court of Appeal, contending that the Board committed reversible error by: finding US '549 invalid based on insufficient evidence to support the verdict, and denying TPL's argument that HP's IPR was barred due to its filing more than a year after Pandigital was sued for patent infringement when the statute is clear on its face as to the year deadline.

        MCM demanded that TPL either proceed with the '549 appeal or abandon that portion of the CORE Flash portfolio back to MCM. MCM asserted that TPL was in default for failing to obtain the approval to pay $291,120 to Alliacense to proceed with the appeal. The Committee agreed to allow the expenditure of $50,000 to perform essential work to preserve the appeal. On November 24, 2014, after conducting its analysis on the merits, costs and potential outcomes of the '549 appeal and the issues related thereto, the Committee determined not to consent to use of

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 19 of 104

further Estate cash to pay for the '549 appeal. It directed TPL to instruct Alliacense to cease charging the Estate for work done on the appeal and to proceed with abandonment or transfer of those rights. TPL brought a Motion To Authorize Compromise And Return By TPL Of '549 Patent Portfolio And Assignment To Portfolio Owner (11 U.S.C. §554(a); FRBP 9019), which motion was granted after hearing on December 11, 2014. As a result, MCM has waived and shall not be able to assert any default under its commercialization agreement with TPL associated with any delay in prosecuting or non-payment of expenses related to the present appeal regarding the '549 patent. The CORE Flash commercialization agreement will continue in force as to the remaining CORE Flash patents.

### 4. Fast Logic Litigation. (See Exhibit "A" for Case Identification)

In September 2011, TPL and others filed suit in the United States District Court for Delaware for infringement of the Fast Logic patents against 31 different companies (which equated to 18 defendant groups). The Delaware litigation seeks an award for damages for past infringement. The four patents that are asserted in the case have all expired either shortly before the filing of suit or shortly afterwards. The defendants filed a variety of defenses asserting that the identified Fast Logic patents are invalid and that the identified products do not infringe the identified Fast Logic patents; additionally, some defendants have asserted counterclaims for declarations of invalidity and non-infringement. Additionally, the Fast Logic Defendants contend that expiration of the patents would limit potential damages even if TPL prevails in the Fast Logic Litigation. TPL disagrees with this statement. Following a Markman hearing, the Court issued a Claim Construction Order on June 30, 2014 and pursuant to such order, all asserted patents remain in the case. On September 5, 2014, the Court denied Defendants' request

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 20 of 104

to file early summary judgment motions. The Fast Logic Defendants contend that Debtor's continued discovery until May 2015 will only amount to exorbitantly high costs which the Debtor must pay out of pocket as discussed at Section VIII-B below. In addition, the Fast Logic Defendants have provided notice to the Debtor that they will seek to have their legal fees borne by the Debtor in accordance with 35 U.S.C. § 285 if the Debtor persists in its pursuit of the Fast Logic Litigation. The Fast Logic Defendants contend that, in light of the Markman decision in the case, such an award is a distinct possibility and certainly cannot be ruled out as a risk of litigation. The Fast Logic Defendants have incurred millions of dollars in legal fees and costs to date, and this amount will continue to grow significantly unless the matter is settled. In addition, the Fast Logic Defendants have informed the Debtor that they may seek administrative expense treatment for any fees awarded to them as a result of the post-petition damages caused by Debtor's pursuit of the Fast Logic Litigation.

To date, TPL has successfully licensed the Fast Logic patents to 13 of the defendant groups. One case (against Elpida) is stayed, and four defendant groups remain as parties in the case (STMicro[10], Toshiba, SanDisk, and Micron). Trial has been recently re-scheduled for the remaining defendant groups as follows: STMicro - Nov. 30, 2015; Toshiba - Dec. 14, 2015; SanDisk - Jan. 25, 2016; and Micron - Feb. 22, 2016.

The Debtor notes further that following a recent mediation on October 20, 2014 with Magistrate Judge Fallon of the District of Delaware, STMicro and TPL entered into a confidential settlement agreement. The settlement subcommittee of the Committee approved the basic terms of the confidential agreement on October 25, 2014. Based on the approval, the

---

[10] Both ST Micro and Toshiba have now settled and will presumably be dismissed in the near future.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 21 of 104

parties are currently finalizing the terms of the appropriate settlement and license agreement with STMicro. Similarly, following a recent mediation on October 22, 2014 with Magistrate Judge Fallon, Toshiba and TPL entered into a confidential settlement agreement. The settlement subcommittee of the Committee also approved the basic terms of the confidential agreement on October 25, 2014. Based on the approval, the parties are currently finalizing the terms of the appropriate settlement and license agreement with Toshiba. TPL also engaged in similar confidential discussions with SanDisk at a mediation on October 17, 2014 in Delaware before Magistrate Judge Fallon. Agreement has been reached with SanDisk. The parties are currently finalizing the terms of the appropriate settlement and license agreement with ST Micro as well. The three settlements referenced above will generate a gross recovery of more than $1.9 million.

**C.** **Other Litigation**

  1. <u>Chester A. Brown, Jr. and Marcie Brown v. TPL et al.</u>

    In December 2009, Chester A. Brown Jr. and Marcie Brown filed a complaint in the superior court for the County of Santa Clara, California (Chester A. Brown, Jr. and Marcie Brown v. Technology Properties Limited LLC et al., Superior Court of California, County of Santa Clara Case No. 1-09-CV-159452) against TPL, for breach of contract, seeking money damages. TPL cross-claimed for several causes of action against the Browns, including alleged breach of contract and misappropriation of trade secrets. After a bench trial regarding contract interpretation and a jury trial in 2012, the jury awarded the Browns $8,887,732 and awarded TPL no damages and no relief.

    After the bankruptcy was filed, the parties agreed to entry of judgment. After calculation for costs, attorneys' fees and prejudgment interest awarded to the Browns, the final award totaled $10,028,429.

    TPL is appealing the amount of the judgment and has filed a notice of appeal, and the Browns have filed a notice of cross-appeal. The opening briefs for both TPL and the Browns

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

15

Case: 13-51589  Doc# 638  Filed: 01/08/15  Entered: 01/08/15 18:00:31  Page 22 of 104

have been filed. Further briefing is expected to be completed by the end of the year. Argument is not expected until after March 2015. All appeals with regard to claims that Mr. Leckrone is the alter ego of TPL have been determined adversely to the Browns.

The Plan provides that if the Browns vote to accept the Plan and do not object to approval of the Plan, 50% of their Allowed Claims will be placed in Class 6A, 25% in Class 6B and 25% in Class 6C. If the Browns also sign the Release in substantially the form as Exhibit "E" to the Plan, their Claim will be allowed, and the appeal will be dismissed

2. <u>Charles Moore v. TPL et al</u>.

Charles Moore commenced arbitration in September 2008 against TPL to resolve an outstanding dispute under the Commercialization Agreement between Moore and TPL (the "Moore-TPL ComAg"). Mr. Moore hired an audit firm to conduct an extensive audit of expenses incurred by TPL to determine whether he had been underpaid under the terms of the Moore-TPL ComAg. An audit report dated January 7, 2010 was sent to TPL but was not definitive, and concluded that either Mr. Moore was significantly overpaid or underpaid. The arbitration was closed in September 2010 after nonpayment of the arbitration fees by Mr. Moore to continue the proceeding. In September of 2010, Mr. Moore filed a Complaint in the Superior Court for Santa Clara County against TPL and others alleging the breach of the Moore-TPL ComAg. (*Charles H. Moore v. Technology Properties Limited LLC et al.*, Superior Court of California, County of Santa Clara Case No. 1-10-CV-183613). TPL filed a Cross-Complaint against Moore and GreenArrays, Inc., a company formed in February 2009 by Mr. Moore and Chester A. Brown following their departure from TPL, for breach of contract, misappropriation of trade secrets, and other causes of action seeking money damages as well as a variety of other remedies. In January 2013, Mr. Moore, TPL, and the other named parties in the lawsuit which did not include Mr. Brown entered into a settlement agreement pursuant to which all of their various respective claims against one another were dismissed except those of TPL against

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

unidentified Cross-Complaint Defendants ("Roes"). TPL may continue to pursue its claims for damages and other remedies on its trade secret misappropriation cause of action against the "Roe" Defendants when they are identified, subject to evaluation.

      3.    <u>Future Litigation</u>.

Planning is underway to pursue strategic additional ITC cases and corresponding District Court infringement litigation when resources become available.

**D.**     **<u>Factors and Events Leading to Bankruptcy Filing</u>**

TPL's cash flow and liquidity has suffered over the past five years for two primary reasons, the first resulting from a change in the intellectual property business environment, and the second as a result of the failed business strategy.

Starting in 2008, TPL's original business model underwent severe testing and has had to evolve. The Portfolios TPL commercializes were subjected to 17 reexamination actions and TPL successfully defended each of them. Generally, these actions challenge the validity of patents and intellectual property they protect, take years and can be very expensive to defend, and limit the ability of the patent holder or other beneficiary to enforce infringement claims while they are underway. At the same time, several companies that utilized TPL's intellectual property elected, rather than purchasing licenses, to infringe and compel enforcement actions against them or file declaratory judgment actions against TPL for a finding of invalidity or non-infringement. The result was years of litigation, significant expenditures in expert analysis to ascertain and prove the infringement, and attorneys' fees and costs to protect and enforce TPL's patent assets. In this period, TPL evolved from a company that itself developed and commercialized technology and patents, to much more of a managerial and litigation support entity with a substantially reduced workforce.

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 24 of 104

TPL also suffered the loss of over $60 million in cash[11] largely as a result of the development of the SEAforth multi-core microprocessor. Because the sales projections for SEAforth never materialized, those branch offices and related infrastructure, including bank accounts, were closed in 2008 and 2009. The losses of the IntellaSys operation combined with the expense of reexaminations and lawsuits made it impossible for TPL to continue the development of the microprocessor device.

The result of these events was threefold: first, a failure to achieve any revenue from the SEAforth investment; second, a distinctly uneven flow of cash controlled by the purchase of licenses by defendants and other infringers based on rulings by the USPTO and in litigation; and, third, a cash bottleneck as multiple litigations, in both Federal District Courts and the ITC, approached critical decision points. These factors, together with the entry of judgment for the Browns against TPL by the Santa Clara County Superior Court, precipitated the filing of the Bankruptcy Case.

## E.     Retention of New CEO.

On July 18, 2014, TPL and the Committee executed a Term Sheet containing all the material terms for the Plan and providing for the resignation of Mr. Leckrone as CEO and his replacement by Arockiyaswamy Venkidu. Mr. Venkidu is the appointed representative agent for a group of shareholders of Onspec Electronics, Inc., and has asserted a Secured Claim in the amount of $5,344,331.00 in the Bankruptcy Case which is accorded treatment in Class 3 under the Plan. Conflicts may arise with respect to Mr. Venkidu appointment as CEO by virtue of his status as a holder of a Secured Claim as well as TPL's representative; however, the initial term of Mr. Venkidu's appointment runs only through the Plan Effective Date, and, thereafter, the Plan

---

[11] Roughly $60 million in Claims have been filed and/or scheduled in the Bankruptcy Case, of which many are disputed by the Debtor. Approximately $10 million is comprised of general Unsecured Claims.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 25 of
104

provides for replacement of the CEO, including Mr. Venkidu, as applicable. [Plan Section VI-B]. In addition, Mr. Venkidu's employment agreement will address the event a direct conflict arises between TPL and the Onspec Shareholders.

Mr. Venkidu also has been appointed to the TPL seat on the PDS board and may not be removed without the written consent of the Committee. In the event Mr. Venkidu leaves the PDS board, his replacement will be named exclusively by the Committee or, after Confirmation, by the CEO subject to the review and agreement of the TPL Board.

All corporate formalities have been observed in appointing Mr. Venkidu as a corporate officer of TPL. Mr. Venkidu and the members of the TPL Board are immediately authorized, directed and empowered to execute any applications, certificates, agreements or any other instruments or documents or amendments or supplements to such documents, including to establish any deposit or savings bank account on behalf of TPL or to do or to cause to be done any and all acts and things within the power and authority granted to them under the Plan.

TPL, the TPL Board and Mr. Venkidu are presently negotiating an employment agreement that will contain, without limitation, the following terms: (1) Term of Employment: an initial period concluding on the Effective Date and then automatically renewed on the Effective Date, subject to replacement and other procedures established in the Plan; (2) Compensation: $120,000 per annum during the interim term and any subsequent term, plus expenses; (3) Indemnification and Insurance: TPL shall indemnify Mr. Venkidu for services as CEO and shall obtain a policy of officers' and directors' liability insurance providing coverage. As set forth above, the proposed agreement also will recognize and addresses the potential of a direct conflict in view of Mr. Venkidu's status as a secured claimant and representative of Onspec shareholders.[12]

---

[12] In the event that this agreement is not finalized or Mr. Venkidu resigns, a new CEO will be appointed by the TPL Board.

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

### III.  TPL'S DEBT AND ASSET STRUCTURE

A.      Secured Debt

TPL has three secured creditors: Cupertino City Center Buildings, Arockiyaswamy Venkidu, and Daniel Leckrone.

   1.      CCC.

CCC and TPL entered into an agreement in March of 2012 (the "CCC Settlement Agreement") to settle a lawsuit arising from TPL's lease of the property located at 20400 Stevens Creek Boulevard in Cupertino, California.  (*Cupertino City Center Buildings v. Technology Properties Limited LLC*, Superior Court of California, County of Santa Clara Case No. 110-CV-186192).  Under the CCC Settlement Agreement, TPL agreed to pay CCC a total of $1.3 million in installments at $50,000 per month over time.  This agreement is secured by a continuing security interest in TPL's share of the proceeds of the following:

   All CORE Flash and Fast Logic litigation;

   TPL's interest in the gross proceeds of a license agreement dated 4/12/06 with FMM Portfolio LLC re the CORE Flash Portfolio (aka Memory Control Management Technology);

   TPL's interest in the gross proceeds of a license agreement dated 6/19/07 with HSM Portfolio LLC re: the Fast Logic Portfolio (aka High Speed Memory Technology);

   Fifty percent of TPL's interest in the gross proceeds of a commercialization agreement dated 6/7/05 between TPL, P-Newco and Patriot re the MMP Portfolio;

   TPL's interest in the gross proceeds of that certain agreement dated 6/22/11 with Agility IP Law LLP re certain CORE Flash Portfolio Patents; and

   TPL's interest in the gross proceeds of a license agreement dated 12/14/07 with Chip Scale, Inc. re the Wafer-Level Chip Scale Technology.

CCC claims to have perfected its security interest by filing a UCC-1 with the California Secretary of State on February 27, 2012. As of the date of filing of this case, the debt claimed

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 27 of 104

owing to CCC was $804,689. Currently roughly $170,000 remains owing due to the payment of adequate protection during the Bankruptcy Case.

      2.     <u>Leckrone</u>.

      Mr. Leckrone has loaned TPL in excess of $4.8 million since January 2009, including interest. In March 2010, TPL and Mr. Leckrone executed a loan and security agreement that covered the current loans and any further loans of Mr. Leckrone to TPL. The security agreement granted a security interest in all of TPL's property, including all intellectual property and inchoate rights.

      Mr. Leckrone claims to have perfected his security interest with the filing of a UCC-1 with the California Secretary of State on April 14, 2010. Mr. Leckrone subsequently subordinated his security interest to that of CCC and has, as set forth below, agreed post-petition to subordinate his security interest to that of Mr. Venkidu as a condition of Mr. Venkidu's consent to the use of cash collateral.

      3.     <u>Venkidu</u>.

      Mr. Venkidu, TPL, and other parties entered into a set of agreements in April 2006 (the "OnSpec Agreement"). This was a multi-party transaction in which OnSpec Electronic, Inc. ("OnSpec") transferred "all right title and interest" in the patent portfolio known as the CORE Flash Portfolio to MCM Portfolio LLC (f/k/a FMM Portfolio LLC); Mr. Venkidu, as the shareholder representative for the former OnSpec shareholders, was granted a security interest in the CORE Flash Portfolio ("the CORE Flash Collateral"); MCM Portfolio LLC and TPL entered into a commercialization agreement; and Mr. Leckrone acquired OnSpec as sole shareholder. Mr. Venkidu recorded UCC-1 financing statements with the California Secretary of State and claims thereby to have perfected his security interests in the CORE Flash Collateral and proceeds therefrom. Financing Statements were recorded in 2006 and, following expiration, again on April 12, 2012.

As of the date of commencement of this case, the debt claimed owing to Mr. Venkidu was approximately $5.3 million.

4.      Lien Priorities.

Mr. Leckrone has a lien against all TPL's assets.  CCC has a lien against the proceeds that TPL receives from collateral identified above, which is substantially less than all TPL's assets.  Mr. Venkidu has a lien against the CORE Flash Collateral.

TPL believes that CCC holds the first priority secured lien position on the collateral securing its lien, owing to Mr. Leckrone's subordination and Mr. Venkidu's break in perfection in 2012.  TPL believes that Mr. Leckrone is the second priority lienholder on all assets against which CCC holds a lien and first priority against all other TPL assets.  TPL believes that Mr. Venkidu is the third priority lienholder on assets against which he holds a lien.

The Committee has questioned the validity of Mr. Venkidu's claim of a lien on the revenue that TPL receives from the CORE Flash Collateral.  Mr. Venkidu's position is that because the right to license the CORE Flash Portfolio was transferred to MCM Portfolio LLC as part of the CORE Flash Collateral, it was subject to his security interest.  Mr. Venkidu argues that the right to license remained subject to the security interest when it was transferred to TPL as part of the commercialization agreement with MCM Portfolio LLC.  Mr. Venkidu claims that the payments to TPL from the third-party licensees are "proceeds" of the right to license, which is his collateral, and thus the payments are also subject to his security interest.

The Committee has taken the position that the consideration given by TPL to MCM Portfolio LLC constituted "proceeds" of the collateral, but that the revenues received by TPL on *its* licenses to third parties are not. Further, the Committee has taken the position that the obligation is that of Mr. Leckrone, as primary obligor under the OnSpec Merger Agreement, and that TPL is only the guarantor of Mr. Venkidu's claim against Mr. Leckrone.

The validity of Mr. Venkidu's lien is preserved for investigation, evaluation, and prosecution under the Plan unless Mr. Venkidu votes in favor of the Plan, including the treatment of his Claim thereunder, , in which case will receive a release of all claims against the Venkidu Claim, including any claims to challenge the extent, validity and priority, or to seek subordination of, such Claim.

**B.      Priority Claims**

TPL listed in Schedule E of the Bankruptcy Schedules unsecured priority claims totaling $9,031,665; the amount scheduled is entitled to priority only in the amount of $136,197. These claims arise from (a) unpaid salary at the date of filing, (b) accrued employee paid time off at the date of filing, and (c) incentive compensation claims of Daniel (Mac) McNary Leckrone, Dwayne Hannah, Janet Neal, Mike Davis, and Nick Antonopoulos. The Employee Compensation Contracts will be rejected as of the Effective Date under the Plan, and all damages, pre- and post-petition, will be treated as general unsecured claims in Classes 6A and 6B.

**C.      General Unsecured Claims**

The bar date for filing claims by non-governmental entities was July 23, 2013. TPL listed approximately $50 million in general unsecured claims in Schedule F, its Schedule of Creditors Holding Unsecured Priority Claims. Almost $40 million of that amount is due to the Claims of 13% investors discussed in Paragraph D below, all of which are disputed. None of the Claims filed materially exceed the scheduled sums for any such filer, other than Robert Neilson, a former consultant, who filed a Claim of $1,245,000 versus a scheduled claim of approximately $300,000; Mike Davis, a former TPL consultant and current Alliacense employee, who filed a Claim of $2,203,502 versus a scheduled claim of $1,030,335; OneBeacon Insurance Company, which filed a Claim of $1,172,368 for defense costs paid in the *Brown v. TPL* litigation versus a scheduled claim of $0; and Shore Chan Bragalone DePumpo LLP, TPL's former contingency

counsel, which filed a Claim for $201,479 versus a scheduled claim of $104,741. In addition, Patriot and Mr. Moore filed contingent Claims based on the potential rejection of the January 2013 Settlement Agreement among the parties, which is discussed in greater detail in section VI.A.1 below. Pursuant to the Plan, the January 2013 Settlement Agreement is assumed, and not rejected; accordingly, these Claims based on rejection of the agreement are disputed.

**D.        Investor Claims - Disputed**

In the early 2000's, certain individuals, including some of Mr. Leckrone's friends and family, were offered an investment opportunity in TPL which entitled them to receive a one percent interest in prospective revenue from two different patent portfolios for a per-percentage-point investment of $50,000. The portfolios were the MMP Portfolio (discussed above) and the Hearing Healthcare Portfolio, neither of which were revenue-generating at the time and both of which were highly speculative in nature. Seven parties invested for a total of a 13% interest (listed below), and TPL assigned the percentage interest in TPL's portion of proceeds to each investor in virtually identical documents titled "Assignment" as part of an "Assignment Agreement"[13]. The total investment by the group of investors was approximately $365,000. Each investor made his or her investment pursuant to the terms of the 2003-2004 Assignment Agreements, with the exception of the Browns who invested $25,000 (rather than $175,000) for their 3.5% interest because TPL agreed to credit them $150,000 for a previous investment in TPL that had not materialized. The Assignment Agreements with Mr. Leckrone's adult children (Susan Anhalt, John Leckrone and Mac Leckrone) are executed by TPL, but not the family member investor. TPL claims that this was an administrative oversight and each investor contends that it does not impair the enforceability of their respective agreements. To date, the 13% Investors collectively have received approximately $5,300,000 in returns.

---

[13] The only variation is that Mac Leckrone provided part cash and part services for his percentage interest, which is provided for in his agreement.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 31 of
104

The percentage entitlement of each Investor is as follows:

| | |
|---|---|
| Chester and Marcie Brown | 3.5% |
| Susan Anhalt | 3.0% |
| John Leckrone | 3.0% |
| Mac Leckrone | 3.0% |
| Alan Marsh | 0.2% |
| James V. Kirkendall | 0.2% |
| Todd Kirkendall | 0.1% |

As discussed more fully above, the Browns received a judgment in their favor of approximately $10 million in their state court action brought to enforce the Assignment Agreement by alleging that the Assignment Agreement entitles them to 3.5% of the total amount of MMP revenue (the "Brown Calculation"), rather than the portion of MMP revenue actually received by TPL (the "Historical Calculation"). Because the MMP Portfolio has multiple owners, TPL is only entitled to a percentage of MMP revenue and not the full amount of every MMP license. TPL contends that the calculation advanced by the Browns and utilized by Superior Court Judge Huber in most instances attributed 100% of the license payments to TPL, but was inconsistent in its treatment of MMP revenue. Thus, even if the Brown Judgment is upheld on appeal, the total amount of all Claims under the Assignment is difficult to ascertain with certainty. Based on Judge Huber's decision, however, an approximation of the amount of the claims of the Investors other than the Browns is $30 million. Under TPL's Historical Calculation, the total amount owed to the investors other than the Browns is approximately $6.3 million, and the Browns' Claim is approximately $2 million. TPL contends that if payments to the investors were based only on TPL's portion of the revenue stream from MMP, then the amount owing to investors would total approximately $900,000. The difference and the dispute of the Brown Judgment, in addition to any potential statute of limitations defenses, comprise the bases for TPL disputing the Claims of the investors.

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 32 of 104

**E.**     **Assets of the Debtor**

As of the Petition Date, TPL had cash on hand totaling $123,772.83.  TPL further listed

the following as assets in its Schedule B – Personal Property:

| Item No. | Asset | Value |
|---|---|---|
| 1 | Bank Accounts | $123,722.83 |
| 3 | Security Deposit with TriNet, the company that provides all of TPL's benefits and payroll services. | $90,000 |
| 3 | Credit due from Mandarin Oriental Hotel | $26,030 |
| 13 | Patriot (OTC: PTSC) Stock (as of 3/20/13) | $329,802 |
| 14 | 50% interest in PDS | Unknown |
| 16 | PDS receivable | $2,866,678 |
| 16 | Reimbursement due from PDS for certain MMP Portfolio expenses | Unknown |
| 16 | Claim against Patriot for expenses on pending litigation | $200,025 |
| 16 | Claim against Patriot for expenses on pending legislation | $152,817 |
| 16 | Employee receivables | $4,000 |
| 18 | Entitled to repayment of cash contraption from PDS | $597,808 |
| 21 | Patent Litigation | Unknown |
| 21 | Claim against shareholders, officers and directors of Green Arrays, Inc. for Fraud, conversion and misappropriation of trade secrets. | Unknown |
| 21 | Claim against OneBeacon Insurance Company for bad faith | Unknown |
| 21 | Potential claims for patent infringement | Unknown |
| 22 | Moore Microprocessor Technology ("MMP") portfolio – partial interest (approx. 22%) | Unknown |
| 22 | Sub-Wavelength Acoustic Technology (SWAT) (certain patents & patent applications) | Unknown |
| 23 | Exclusive Licenses to commercialize technology; the agreements entitle TPL to a share of the revenue earned | Unknown |
| 23 | License Agreements with ongoing payments | $0.00 |
| 25 | 2008 BMW 750LI | $22,749 |
| 28 | Office furniture, equipment and software | $16,500 |
| 29 | Tooling & Lab Equipment | $3,000 |
| 29 | Leasehold improvements | $0 |
| 30 | Finished Goods Inventory | $25,000 |
| 35 | Product Samples | Unknown |
| 35 | SEAforth Chip Technology, Mask Sets and Product Tooling | Unknown |
| 35 | Wafers | Unknown |

| 35 | Pre-paid expenses | | $14,468 |
|----|-------------------|---|---------|
| | | | |
| | TOTAL | | $4,472,651.31 |

The $4,472,651.31 in personal property, listed largely at book value, does not include the value of licensing and infringement litigation with regard to TPL's rights in the Portfolios. TPL believes that its total assets, given adequate time over the Plan's term and thereafter, to develop, commercialize, license, and enforce its rights in intellectual property, exceeds $100 million. Expert testimony will be presented regarding valuation in the event that Confirmation is contested. The total above also does not include potential avoidance claims against insiders and affiliates, which are of unknown value.

## IV. POST BANKRUPTCY EVENTS

Since the filing of this case on March 20, 2013, the relationship between the Committee and TPL up to the filing of the Plan has been contentious. The Committee filed objections to the use of cash collateral, the first of which was overruled, and ultimately acquiesced in stipulations allowing such use. As cash availability dwindled, TPL reduced its workforce until it now totals one: the CEO who replaced Mr. Leckrone.

The Committee and TPL negotiated a settlement procedures protocol, pursuant to which the Committee was to participate in the approval of settlements with defendant infringers in litigation brought by TPL to enforce its patent rights, but which resulted in disputes over whether the settlement protocol had been followed. The Committee agreed, for the most part, with the retention and appointment of professionals by TPL for, among other things, prosecution of infringement litigation. The Committee and TPL also negotiated a non-disclosure agreement, pursuant to which confidential and proprietary information could be disclosed to the Committee for its use in performing its duties in the Bankruptcy Case.

TPL and the Committee participated in two full days of mediation before the Honorable Dennis Montali on October 9-10, 2013, which proved to be unsuccessful. The Committee filed a

motion to terminate the exclusive right of TPL to solicit and confirm a plan of reorganization, which was granted by the Court. Subsequently, the Committee filed its own disclosure statement and plan of reorganization and also filed motions to appoint a chapter 11 trustee and for standing to investigate and prosecute pre-petition claims against the insiders of the Debtor. Negotiations resumed on a joint plan and, based in large part on the work done by the parties in the mediation, the parties agreed on the terms of the joint Plan which is the subject of this joint Disclosure Statement.

On July 18, 2014, as part of the Term Sheet[14] signed by TPL, the Committee and Daniel E. Leckrone setting forth the terms of a joint plan, Mr. Leckrone resigned as TPL's CEO and from the management committee of PDS. As set forth above, Mr. Leckrone has been replaced in both positions by Arockiyaswamy Venkidu pending confirmation of the joint plan. The TPL Board, TPL, and Mr. Venkidu are negotiating an employment agreement the terms of which are described above.

Creditor Charles H. Moore filed a Motion to Appoint Chapter 11 Trustee and to Remove Debtor-In-Possession on September 3, 2014. The motion came on for hearing on October 2, 2014, and November 12, 2014. On December 3, 2014, the Bankruptcy Court issued a detailed order denying the motion [Dkt. #623]. Mr. Moore also filed a competing creditor plan and an accompanying disclosure statement. The Bankruptcy Court, after several hearings and multiple amendments, on December 3, 2014, denied approval of the Disclosure Statement Re: Moore Monetization Plan of Reorganization (October 29, 2014) [Dkt. #624].

---

[14] The Term Sheet provides that the new CEO shall not be entitled to privileged communications dated prior to July 18, 2014, between TPL and Binder & Malter LLP and shall not assert or waive any privilege belonging to the Debtor or the Reorganized Company with respect to any such communications with Binder & Malter LLP and/or Dorsey & Whitney LLP. This was a negotiated provision that the Committee and TPL agreed to as a measure to protect the confidentiality of more than a decade of representation of TPL by Binder & Malter, LLP from unnecessary disclosure by a successor CEO or some other entity or person.

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 35 of 104

## V. SUMMARY OF PLAN OF REORGANIZATION

The following is an executive summary of the Plan. You are urged to read the Plan itself. In the event of any conflict between the Plan and this Disclosure Statement, the Plan controls.

### A. Plan Type: Reorganization

The Plan is a plan of reorganization under which TPL will operate and pay its creditors quarterly for a period of up to seven years after its Effective Date to achieve full payment of all allowed claims. Such Quarterly Payment shall be comprised of (i) the portion of revenue to which TPL is entitled, plus (ii) distributions deposited by PDS, if any, to the Claims Trust Account comprised of 100% of TPL's share of distributions from for such quarter, less the Administrative Claims Contribution, the necessary operating expenses of the Reorganized Company, and the amounts necessary to fund and maintain the WCR.

The CEO and the TPL Board, comprised of at least two Committee members or their nominees, shall remain in place and in control of the Reorganized Company, with all of the rights and powers provided to them under the Plan, until such time as Allowed Claims in Classes 1, 2, 3, 4, 5 and 6 are paid in full with interest under the Plan. Payments will be made on a quarterly basis until the Estate has been fully administered.

### B. Classes Of Claims and Treatment Thereof

There are seven classes of claims and one class of interests under the Plan. The identity of each class and its treatment under the Plan follows:

**Unclassified Claims**[15]

Administrative Claims – Non-Professionals.

---

[15] Administrative expense and post-petition tax claims by governmental units entitled to priority under Section 507(a)(2) of the Code, as well as pre-petition unsecured priority tax claims entitled to priority under Section 507(a)(8) of the Code are not classified under the Plan.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 36 of 104

Except to the extent that the holder of a particular Administrative Claim has agreed to a different treatment of such Claim, each holder of an Allowed Administrative Claim shall be paid in cash, in full upon the later of: (a) the Effective Date; (b) if such Claim is initially a Disputed Claim, if and when it becomes an Allowed Administrative Claim; and (c) if such Claim is incurred after the Petition Date in the ordinary course of the Debtor's business, within such time as payment is due pursuant to the terms giving rise to such Claim or as otherwise authorized by the Bankruptcy Court.

Except as otherwise provided in the Plan in the event that the Bankruptcy Case is converted to Chapter 7, Allowed Administrative Claims, if any, of all of the Released Parties will be subordinated to Claims in Classes 1 through 6C such that payments on any such Allowed Administrative Claims will be deferred until payment of, or reservation in full of, Claims in Classes 1 through 6C.

Administrative Claims - Professional Fee Claims.

All final requests for payment of Professional Fee Claims shall be filed with the Bankruptcy Court and served no later than sixty (60) days after the Effective Date. After notice and a hearing, the Allowed Amounts of such Professional Fee Claims will be determined by the Bankruptcy Court and, once Allowed pursuant to entry of an order by the Bankruptcy Court, will be promptly paid by the Reorganized Company, subject to the funding of the Administrative Contribution Fund.

Priority Tax Claims.

Except to the extent that the holder of a particular Priority Tax Claim has agreed to a different treatment of such Claim, each holder of an Allowed Priority Tax Claim shall be paid in cash, in full upon the later of: (a) the Effective Date; and (b) if such Claim is initially a Disputed Claim, if and when it becomes an Allowed Priority Tax Claim.

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 37 of
104

**Classified Claims**

Class 1. Claimants holding Allowed Claims based on employee wages and benefits (up to $11,725) will be paid in cash, in full upon the later of: (a) the Effective Date; or (b) if such Claim is initially a Disputed Claim, when and if it becomes an Allowed Claim.

Class 2. The first priority secured Allowed Claim of Cupertino City Center ("CCC") will receive the following treatment under the Plan: CCC will retain all valid and perfected liens, security interests and other encumbrances against its collateral. CCC will accept $180,000 in full satisfaction of its indebtedness under the CCC Settlement Agreement, which amounts to a waiver of approximately $340,000 of its current balance of $520,000. Consistent with the provisions of the Plan, TPL expects CCC to be paid in one installment on the Effective Date. CCC will receive 75% of the Quarterly Payment until the Allowed Secured Claim of CCC is paid in full with 10% per annum simple interest. Payment will commence on the first day of the first calendar quarter after the Effective Date. TPL expects CCC to be paid the $170,000 balance owed to it in the first payment. The remaining portion of the Quarterly Payment will be deposited into the Claims Trust Account and reserved to pay interest on Mr. Venkidu's Allowed Class 4 Claim and the Allowed Claims of Class 6A as summarized below. CCC's lien will remain on said funds until it has been paid in full.

Class 3. The second priority secured Allowed Claim of Daniel E. Leckrone will receive the following treatment under the Plan: Mr. Leckrone will retain all valid and perfected liens, security interests and other encumbrances against his collateral. Mr. Leckrone will voluntarily subordinate his Secured Claim which will be treated as a Class 7 claim under the Plan for purposes of the timing of payment as described below. By voting in favor of the Plan, Mr. Leckrone consents to the subordination of his payments and shall receive a release of all claims and causes of action against the Leckrone Secured Claim, including any claims to challenge the extent, validity and priority, or to seek further subordination thereof except as set forth below. If the Bankruptcy Case is converted to Chapter 7 after Confirmation, the aforementioned release of

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 38 of 104

claims shall be undone automatically, as shall any subordination of Claims or liens by Mr. Leckrone, without further order of the Bankruptcy Court. The Chapter 7 trustee shall have the ability to pursue all claims against Mr. Leckrone. As a condition of Confirmation, Mr. Leckrone shall execute a tolling agreement to extend the two-year statute of limitations of 11 U.S.C. section 546(a)(1) for the term of the Plan, such that a chapter 7 trustee will have one year from the date of his or her appointment to file any Avoidance Actions against Mr. Leckrone.

Class 4. The third priority secured Allowed Claim of Arockiyaswamy Venkidu receives the following treatment under the Plan: Mr. Venkidu will retain all valid and perfected liens, security interests and other encumbrances against his collateral. Under the Plan (i) Mr. Venkidu will receive payments of 7% simple interest on the Allowed Secured Claim from 25% of the Quarterly Payment until payment in full of, or reservation for, Allowed Claims in Class 2; and then (ii) Mr. Venkidu will receive on account of his Allowed Secured Claim, 75% of the Quarterly Payment until his Allowed Secured Claim has been paid in full together with 7% simple interest per annum. A vote in favor of the Plan by Mr. Venkidu effects a compromise of all claims for avoidance of his lien.

Class 5. The Allowed Claims of (1) holders of unsecured claims equal to $5,000.00 or less, or (2) of holders of unsecured claims greater than $5,000.00 who elect treatment pursuant to Class 5 under the Plan and agree to reduce their respective Allowed Claims to $5,000.00, will receive a single cash payment in the amount its Allowed Claim, not to exceed $5,000.00, which payment will be in full and final satisfaction of each respective Class 5 Claim.

Class 6A. Class 6A is comprised of General Unsecured Claims, 50% of each of the Accepting Non-Insider 13% Claims[16], 75% of each of the Employee Compensation Claims and 25% of each of the Insider Employee Compensation Claims.

---

[16] Under the Plan, Accepting Non-Insider 13% Claims are the Non-Insider 13% Claims solely in the instance the Browns accept the Plan and/or do not object to confirmation of the Plan. In the instance there

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 39 of 104

Holders of (i) Class 6A Accepting Non-Insider 13% Claims who provide releases to the Released Parties, (ii) Employee Incentive Compensation Claims and (iii) Subordinated Insider Employee Incentive Compensation Claims who vote in favor of the Plan and do not object to approval of the Plan will be deemed to be Allowed Claims which are not subject to dispute with the exceptions of: (a) the difference between the amount asserted in the Employee Incentive Compensation Claim of Robert Neilson (Claim No. 4) and the amount scheduled in the Debtor's Schedules attributable to Robert Neilson and (b) the difference between the amount asserted in the Employee Incentive Compensation Claim of Mike Davis (Claim No. 35) and the amount scheduled in the Debtor's Schedules attributable to Mike Davis. Claims of holders of Class 6A Accepting Non-Insider 13% Claims who do not provide releases shall not be deemed to be Allowed Claims, but instead will be deemed Disputed Claims, subject to the outcome of the Brown Appeal.

Employee Incentive Compensation Claims and Subordinated Employee Incentive Compensation Claims of Claimants who do not vote in favor of the Plan or object to approval of the Plan are subject to objection. Confirmation of the Plan will also constitute an agreement by the Accepting Non-Insider 13% Claimants that any payment representing satisfaction of any post-petition obligations of the Debtor or future obligations of the Reorganized Company under the Assignment Agreements, to the extent that any such obligations still exist, shall be deferred until such time as all Allowed Claims in Classes 1, 2, 4, 5, 6A, 6B, 6C and 7 have been paid with interest.

Holders of Class 6A Allowed Claims will receive payment in full over time with interest calculated at five percent *per annum* or such other rate as the Bankruptcy Court may direct, from quarterly *pro rata* payments of (i) the balance of the 25% of the Quarterly Payment after

are no Accepting Non-Insider 13% Claims, 100% of all Non-Insider 13% Claims and all Insider 13% Claims will be classified in Class 6C.

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

payment of, or reservation for, 7% simple interest on the Allowed Class 4 Claim, until Allowed Claims in Classes 1, 2 and 5 have been paid, or reserved for, in full; then (ii) 25% of the Quarterly Payment until Allowed Claims in classes 1, 2, 4, and 5 have been paid, or reserved for, in full; and then (iii) 100% of the Quarterly Payment following the payment in full of, or reservation for, the Allowed Claims in Class 1, Class 2, Class 4 and Class 5, in accordance with the Plan.

Class 6B.  Class 6B is comprised of 25% of each of the Accepting Non-Insider 13% Claims, 25% of each of the Employee Compensation Claims and 75% of each of the Insider Employee Compensation Claims.

Holders of (i) Class 6B Accepting Non-Insider 13% Claims who affirmatively vote to accept the plan and do not object to confirmation of the Plan and who provide releases to the Released Parties, (ii) Employee Incentive Compensation Claims and (iii) Subordinated Insider Employee Incentive Compensation Claims who vote in favor of the Plan and do not object to approval of the Plan will be deemed to be Allowed Claims which are not subject to dispute with the exceptions of: (a) the difference between the amount asserted in the Employee Incentive Compensation Claim of Robert Neilson (Claim No. 4) and the amount scheduled in the Debtor's Schedules attributable to Robert Neilson and (b) the difference between the amount asserted in the Employee Incentive Compensation Claim of Mike Davis (Claim No. 35) and the amount scheduled in the Debtor's Schedules attributable to Mike Davis.  Claims of holders of Class 6A Accepting Non-Insider 13% Claims who do not provide releases shall not be deemed Allowed Claims, but instead will be deemed Disputed Claims, subject to the outcome of the Brown Appeal.

Holders of Class 6B Allowed Claims will receive payment in full over time with interest calculated at five percent *per annum* or such other rate as the Bankruptcy Court may direct, from

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 41 of 104

quarterly *pro rata* payments of 100% of the Quarterly Payment following the payment in full of, or reservation for, the Allowed Claims in Class 1, Class 2, Class 4, Class 5 and Class 6A.

Class 6C. Class 6C is comprised of either of (i) 25% of each the Accepting Non-Insider 13% Claims or (ii) 100% of the Non-Insider 13% Claims and 100% of the Insider 13% Claims.

Class 6C Accepting Non-Insider 13% Claims whose holders affirmatively vote to accept the Plan and do not object to confirmation of the Plan and provide releases to the Released Parties will be deemed to be Allowed Claims which are not subject to dispute.

Subject to the following paragraph, holders of Allowed Class 6C Accepting Non-Insider 13% Claims, if any, will receive payment in full over time with interest calculated at five percent per annum or such other rate as the Bankruptcy Court may direct, from quarterly pro rata payments of 100% of the Quarterly Payment following the payment in full of, or reservation for, the Allowed Claims in Class 1, Class 2, Class 4, Class 5, Class 6A and Class 6B.

Alternatively in the instance that there are no Accepting Non-Insider 13%er Claims (i.e., if the Browns do not accept the Plan and/or object to approval of the Plan), 100% of all Non-Insider 13% Claims and all Insider 13% Claims will be classified in Class 6C and holders of Allowed Class 6C Claims will receive payment of 20% of the Allowed Amount of their Claims over time from quarterly pro rata payments of 100% of the Quarterly Payment following the payment in full of, or reservation for Disputed Claims, the Allowed Claims in Class 1, Class 2, Class 4, Class 5, Class 6A and Class 6B.

Class 7. The Claims of Mr. Leckrone, Alliacense and Interconnect Portfolio LLC, and Insider 13% Claims to the extent not classified in Class 6C are subordinated by the Plan to all Claims, including without limitation, unclassified Claims and the Claims of creditors in Classes 1, 2 and 4 through 6.

Holders of Class 7 Claims will, if they vote to accept the Plan, be deemed Allowed in an amount equal to 100% of their Claims, and after payment in full with interest of, or reservation

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 42 of 104

for, Allowed Claims in Class 1, Class 2, Class 4, Class 5, and Class 6, will receive *pro rata* distributions of 100% of the Quarterly Payment, up to the full Allowed Amounts, together with interest at five percent *per annum* or such other rate as the Bankruptcy Court may direct, in accordance with the Plan.

If holders of Claims in Class 7 do not vote to accept the Plan, then each Claim in Class 7 will be deemed a Disputed Claim under the Plan and will not receive distributions under the Plan until entry of a Final Order determining the Allowed Amount of each particular Insider 13% Claim.

Confirmation of the Plan will also constitute an agreement by the Insider 13% Claimants that any payment representing satisfaction of any post-petition obligations of the Debtor or future obligations of the Reorganized Company under the Assignment Agreements, to the extent that any such obligations still exist, shall be deferred until such time as all Allowed Claims in Classes 1, 2, 4, 5, 6A, 6B, 6C and 7 have been paid in full with interest.

Class 8. Class 8 consists of the equity Interest in TPL. Mr. Leckrone will, as the holder of all equity interests in TPL, retain his Interests. On the Effective Date, the Interest Holder will cede all rights to control the management and governance of the Reorganized Company as an Interest holder, and such rights will become vested in the CEO. Once all Unclassified Claims and the Allowed Claims of creditors in Classes 1, 2, 4, 5, 6A, 6B and 6C are paid in full, all rights to control the management and governance of the Reorganized Company will automatically revert to the holder of the Class 8 Interests, and the Committee and the TPL Board will immediately and automatically lose all authority with respect to the Reorganized Company.

Confirmation of the Plan shall constitute and effect a full release of all Avoidance Actions, claims, causes of action and claims for relief against the Released Parties whether or not any of the Released Parties execute the Release except that, as to Daniel E. Leckrone and the IP Owners only, if the Bankruptcy Case is converted to Chapter 7 after Confirmation, the release of

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 43 of 104

claims shall be undone automatically, as shall any subordination of Claims or liens held by Leckrone and the IP Owners, without further order of the Bankruptcy Court. The Chapter 7 trustee shall have the ability to pursue and all claims against Leckrone and the IP Owners. Confirmation also effects a mutual release of the Released Claims of the Estate and Reorganized Company as to all parties who execute the Release. The release of the Released Parties effectuated by Confirmation of the Plan is a compromise of controversy pursuant to Federal Rule of Bankruptcy Procedure 9019. The consideration for the compromise is the subordination of Claims and liens by all of the Released Parties who vote in favor of the Plan to all unclassfiied Claims and Allowed Claims in Classes 1-6C.

## C.  **Means of Execution of Plan**

**New Management**.

Under new management, the Reorganized Company will continue TPL's existing commercialization activities and specifically, continue to exercise and enforce TPL's rights to manage litigation relating to the various patent portfolios. PDS will remain responsible for monitoring licensing and settlements relating to the MMP Portfolio.

The Reorganized Company will be permitted to establish a working capital reserve (the "WCR") in an amount determined as necessary by the CEO with the advice and consent of the TPL Board. At any time in which the WCR is reduced from $500,000, the Reorganized Company may replenish the WCR up to $500,000. The Reorganized Company shall not withdraw any funds from the WCR and shall not replenish the WCR without first consulting with and obtaining written approval from the TPL Board.

To the extent not already completed, the TPL Member will execute the Amendment to the TPL Operating Agreement implementing the provisions of the Plan. Mr. Venkidu will replace Mr. Leckrone as the CEO of TPL to exercise the duties and responsibilities of a manager as specified in the TPL Operating Agreement and Amendment to run the business operations of

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 44 of 104

the Reorganized Company, including, but not limited to, the commercialization of all portfolios, subject to the direction of the TPL Board appointed by the Committee.

The Committee will appoint the TPL Board of the Reorganized Company. The CEO will be responsible for the management of the Reorganized Company's business and affairs subject to the advice, consent and direction of the TPL Board. Except for any matters relating to the prosecution of objections to the Committee Claims, the TPL Board will oversee the Plan Agent, including monitoring the expenditures of the Plan Agent and those of his or her professionals up to an annual cap of $75,000 unless increased by agreement of the TPL Board and CEO including with respect to administering the Claims Trust Account. The TPL Board will be authorized and empowered to hire, supervise and, subject to the Notice Procedure and the terms of the Plan, dismiss and replace the CEO without further Bankruptcy Court approval. The TPL Board will fulfill TPL's obligations under the PDS Operating Agreement together with TPL's representative on the PDS management committee, as well as all existing commercialization and other agreements to which TPL is a party.

The TPL Board will act as a fiduciary of the Reorganized Company and will have the power and responsibility to approve major company actions, disposing of major assets provided that it complies with certain procedures set forth in section VII.J. of the Plan (regarding taxes) and subject to consent of the TPL Member as is otherwise required by the TPL Operating Agreement, Amendment and applicable California law. In no event may the Reorganized Company, the CEO, or the TPL Board take any action outside the ordinary course of business without consent of the TPL Member that would otherwise require such approval under applicable State law or the TPL Operating Agreement and Amendment.

Other than as provided for in the Plan, the Reorganized Company will not dispute Claims that have been voluntarily subordinated.

To the extent not already completed, on the Effective Date, Mr. Leckrone will be terminated as manager and Chairman of TPL, as a member of the PDS Management Committee, and will not exercise any supervisory, managerial, officer or decision making role for TPL, until Allowed Claims in Classes 1, 2, 3, 4, 5, 6A, 6B and 6C are paid in full with interest pursuant to the Plan, at which time Mr. Leckrone will then be automatically restored to any such roles as they existed prior to the Effective Date.

The CEO, under the supervision of the TPL Board, will manage the day-to-day operations of the Reorganized Company, including the commercialization of the company's portfolios. Among other things, the CEO, in consultation with the TPL Board, and subject to the cap on WCR, will evaluate the Reorganized Company's staffing needs, and will retain, hire or contract with any employees and consultants s/he deems necessary in her/his business judgment; will review and evaluate TPL's books and records; will ensure all expenditures are properly accounted for and are "ordinary and necessary" pursuant to generally accepted accounting principles; and will fulfill the obligations in the commercialization agreements for the company's portfolios. The CEO and the TPL Board will keep TPL's books and records in accordance with GAAP, maintain all corporate formalities and ensure the timely filing of all tax returns.

Approval of settlements and licensing for TPL is and will be the responsibility of the CEO, subject to the advice, direction and consent of the TPL Board.

The CEO will confer with and obtain written approval from the TPL Board prior to pursuing any new business endeavors and prior to selling, transferring or licensing any TPL assets. The CEO will also confer with and obtain TPL Board approval prior to pursuing and consummating any other major company actions and any other actions for which the TPL Board, in its discretion, may require approval; provided, however, that the Reorganized Company complies with certain procedures set forth in section VII.J. of the Plan.

In the event of any deadlock in voting between TPL Board members, the vote will be referred to and resolved by vote of the Committee.

The Reorganized Company will obtain, subject to the cap on WCR, liability insurance to provide comprehensive insurance coverage for losses of or advancement of defense costs to the CEO, the TPL Board and to the extent permissible under applicable law, the Committee, related to any legal action brought against such Entities and Persons in their capacity as directors and officers.

The CEO and the TPL Board will remain in control of the Reorganized Company until such time as Allowed Claims in Classes 1, 2, 3, 4, 5, 6A, 6B and 6C are paid in full with interest under the Plan. After such payment occurs, the Committee will be immediately dissolved and all members of the Committee on the TPL Board will be deemed to have resigned therefrom without further order or notice.

**Plan Agent**.

On or before the Effective Date, the Committee will appoint the Plan Agent who, among other things, will manage the Claims Trust Account and act as the Disbursing Agent responsible for disbursing Distributions to the holders of Allowed Claims in accordance with the Plan.

The Plan Agent will independently investigate and, if appropriate in her/his business judgment, object to the Committee Claims. Other than the Debtor or the Reorganized Company, the Plan Agent will have exclusive authority to investigate and file objections to all creditor Claims.

The Reorganized Company will, in consultation with and after obtaining written approval from the TPL Board, pay reasonable compensation to the Plan Agent and his or her professionals in an amount not to exceed $75,000 per year, subject to increase as provided for in the Plan.

**Payment Of Distributions**.

Claims Trust Account.

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 47 of 104

On or before the Effective Date, the Reorganized Company will establish a separate, segregated bank account for the benefit of holders of Allowed Claims, which shall be the Claims Trust Account and will be funded with amounts from the Quarterly Payment adequate to make all payments due on the Effective Date. The Quarterly Payment will be comprised of (i) that portion of revenue to which TPL is entitled plus (ii) distributions deposited by PDS, if any, to the Claims Trust Account comprised of 100% of TPL's share of distributions from PDS for such quarter, less the Administrative Claims Contribution (used to pay holders of Allowed Administrative Claims who agree to accept treatment other than payment in cash in full on the Effective Date), the necessary operating expenses of the Reorganized Company, and the amounts necessary to fund and maintain the WCR.

No later than three Business Days after the close of each full calendar quarter following the Effective Date, the Reorganized Company will deposit the portion of the Quarterly Payment for which it is responsible into the Claims Trust Account; provided, however, that in any quarter in which the deposit of the Quarterly Payment to the Claims Trust Account would, in the Reorganized Company's reasonable opinion, result in a reduction of the WCR, then, following consultation with and receipt of written approval of the TPL Board as to such said reduction, the Quarterly Payment for that quarter will be reduced accordingly. Such reduction shall not constitute a default under the Plan; provided, however, that the Reorganized Company has deposited the aggregate of at least 20% of Adjusted Gross Revenue during each calendar quarter. The Disbursing Agent will distribute from the Claims Trust Account the sums specified on the Quarterly Distribution Report on the Distribution dates specified in the Plan.

Distribution of proceeds, if any, received from portfolios other than the MMP Portfolio, CORE Flash Portfolio, Fast Logic Portfolio and Chipscale Portfolio, will be subject to the commercialization agreements and inventor agreements applicable to such portfolio, and will be distributed in accordance with the schedule on Exhibit "C" attached to the Plan. TPL will retain

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 48 of 104

80% of net proceeds received from such other portfolios; provided that doing so does not breach of any agreement with respect to such portfolio.

<u>Distributions</u>.

No later than five Business Days after the close of each full calendar quarter following the Effective Date, the Reorganized Company shall deliver the Quarterly Distribution Report to the TPL Board and the Plan Agent and any creditor who has requested a copy of such Quarterly Distribution Report. The Quarterly Distribution Report will include a list of all Claims in Classes 2, 3, 4, 6 and 7 and the Reorganized Company's calculations for each Claim, including: (i) the amount of the Allowed Claim, if applicable (ii) the undisputed portion of any Disputed Claim, (iii) the pro rata Distribution amount for the quarter, and (iv) the interest owing for the quarter calculated at the applicable interest rate as provided in the Plan. The Plan Agent, in its capacity as Disbursing Agent, will make Distributions from the Claims Trust Account in the sums and to the addresses specified on the Quarterly Distribution Report no later than the tenth Business Day following the end of each calendar quarter, except as otherwise provided in the Plan.

Except as otherwise provided in the Plan, the Disbursing Agent will pay all Class 1 and Class 5 Allowed Claims on the Effective Date, or as otherwise agreed by a particular Class 1 or Class 5 creditor with the Reorganized Company. Failure to pay any Allowed Claim in Class 1 or Class 5 as required under the Plan will constitute a Plan default unless the Disbursing Agent pays the amount due on account of such Allowed Claim as required under the Plan within thirty days of the Effective Date, unless otherwise agreed by a particular Class 1 or Class 5 creditor with the Reorganized Company.

The Reorganized Company shall continue to operate and the Disbursing Agent shall pay Allowed Claims in Classes 6 and 7 in full with interest, according to the terms of the Plan for a period of seven years after the Effective Date, or, after consultation with and obtaining written

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 49 of 104

approval from the TPL Board, an additional period of time not to exceed six months; provided, however, that such period may be extended further by order by the Bankruptcy Court.

Disputed Claims.

Subject to the next sentence, any Cash that would be distributed to the holder of a Disputed Claim if it were an Allowed Claim on any Distribution Date will be set aside by the Disbursing Agent into a Disputed Claims Reserve Account (i.e., a segregated interest-bearing bank account maintained for the purpose of holding Cash attributable to Disputed Claims). No later than fifteen (15) days after the Disbursing Agent receives notice that a Disputed Claim has been Allowed in whole or in part, the Disbursing Agent will distribute the Cash deposited into the Disputed Claims Reserve Account on account of the Allowed Amount of such Disputed Claim. Excess Cash payments made into the Disputed Claims Reserve Account on account of a Disputed Claim shall be returned to the Claims Trust Account for the funding of the next Quarterly Payment.

**Authority Of Reorganized Company**.

On the Effective Date, the CEO of the Reorganized Company will be appointed Estate representative pursuant to the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. Except as otherwise provided by the Plan, the Reorganized Company, by and through its CEO and any designee(s) after obtaining written approval from the TPL Board and the Committee as applicable, will be responsible for and have authority to: (a) settle, resolve and object to Claims; (b) commence suit on the Retained Claims or refer any Retained Claims to the Plan Agent; (c) pay all fees due under 28 U.S.C. § 1930; (d) file any post-Confirmation reports required by the Plan or the Bankruptcy Court; (e) retain, employ and utilize such Professionals as may be necessary without further approval of the Bankruptcy Court; (f) sell or dispose of assets; (g) abandon property of the Estate that is determined to be burdensome or of inconsequential value; (h) do all things necessary and appropriate to fulfill the duties and obligations of the

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 50 of 104

Reorganized Company under the Plan and to fully administer the Bankruptcy Estate as required by the Plan, the Order of Confirmation, the Bankruptcy Code and the Bankruptcy Rules; and (i) move for the entry of a Final Decree and prepare and file any pleadings as may be required by the Bankruptcy Court in connection with the Final Decree and the closing of the Bankruptcy Case.

In addition, on the Effective Date, the Reorganized Company will be substituted as successor to the Debtor and its Estate in all actions, contested matters and adversary proceedings pending or thereafter commenced in the Bankruptcy Court with respect to Disputed Claims. The Reorganized Company will have no obligation to pursue any affirmative claims on behalf of the Debtor or its Estate other than the Brown Appeal and any resulting trial, and any such claims may be abandoned or waived at the discretion of the Reorganized Company subject to the approval of the TPL Board if required; provided, however, that if Browns sign the Release, the Brown Appeal will be dismissed.

**Responsible Person**.

From and after the Effective Date, the CEO shall be the Responsible Person for the Reorganized Company and may execute all documents, agreements and instruments implementing the Plan without further order of the Bankruptcy Court or further action by the managers or member(s) of the Reorganized Company, subject to the terms of the Plan and any other requirements for TPL Board approval as required by the TPL Board. The CEO will be entitled to act as the Estate representative for purposes of implementing and administering the Plan without need for further corporate action or order of the Bankruptcy Court.

The Reorganized Company shall, in consultation with and after obtaining written approval from the TPL Board, pay reasonable compensation to the CEO subject to the cap on WCR.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 51 of 104

**Disbursing Agent**.

The Disbursing Agent for all Distributions will be the Plan Agent. The Reorganized Company, in consultation with and after written approval from the TPL Board, may relieve the Plan Agent from its responsibilities as the Disbursing Agent and may appoint a successor Disbursing Agent at any time upon providing fifteen (15) days' notice to the Notice Parties pursuant to the Notice Procedure. If an objection to the appointment of the newly proposed Disbursing Agent is timely filed within such fifteen (15) day period, the objection will be set for hearing before the Bankruptcy Court on no less than twenty-one (21) days' notice to the Notice Parties. Any successor Disbursing Agent will be entitled to receive reasonable compensation. Unless otherwise ordered by the Bankruptcy Court, the Disbursing Agent will serve without a guaranty or fiduciary bond.

**Taxes**.

The Reorganized Company shall file or cause to be filed in a timely manner any and all tax returns and pay in a timely manner any and all taxes (including, but not limited to, income, payroll, property and business) arising out of the operations of the Debtor and/or the Reorganized Company except with respect to distributions made by the Reorganized Company to the Member. Except with respect to taxes assessed against Leckrone as TPL's Member for pre-petition activity by TPL which are unrelated to any action taken by TPL as the Debtor, the Reorganized Company shall pay as and when due all taxes attributable to any action taken by TPL as the Debtor or the Reorganized Company which are attributed to or assessed against the TPL Member including but not limited to taxes arising from out of the ordinary course of business sales of assets, changes in entity form, amendments of prior tax returns and/or the recharacterization of transactions and shall indemnify and hold the TPL Member harmless with

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 52 of 104

respect thereto. The Reorganized Company shall not be liable for taxes assessed against Leckrone as TPL's Member for pre-petition activity by TPL which are unrelated to any action taken by the Reorganized Company, the TPL Board, the CEO, the Committee or the Plan Agent. Leckrone shall be responsible for such taxes that and shall indemnify and hold harmless the Reorganized Company with respect thereto. The Reorganized Company shall, prior to taking any action that may result in any such tax liability, supply the TPL Member with an analysis of the anticipated tax effect of any such action as well as the ability of the Reorganized Company to pay the tax liability as and when due.

The TPL Member shall notify the Reorganized Company within two business days of the delivery of the analysis if there is any disagreement on the amount of taxes or ability of the Reorganized Company to pay them as and when due. In the event of a timely notification, the Reorganized Company may set a hearing in the Court on no less than three (3) days' notice. An, order of the Bankruptcy Court shall be required prior to the Reorganized Company taking the proposed action unless the tax liability in question is less than $15,000 and funded by the Reorganized Company in advance. Each of the Reorganized Company or TPL and Leckrone or the TPL member shall submit its position in writing to the Court on or before the hearing date, and the foregoing persons and entities agree to an accelerated hearing upon three days' notice subject to the Court's availability.

**Employee Benefit Plans**.

Employee Benefit Plans in effect as of the Effective Date will be continued by the Reorganized Company, subject to its rights to modify its Benefit Plans pursuant to applicable non-bankruptcy law. Any obligations of the Debtor to indemnify any Person serving as a fiduciary of any Benefit Plan of the Debtor under charter, by-laws, contract or applicable state law is deemed to be an executory contract and assumed as of the Confirmation Date (but subject

to the occurrence of the Effective Date) and binding on the Reorganized Company. For the avoidance of doubt, Benefit Plans do not include any Insider Employee Compensation Contracts or any provisions thereunder for incentive compensation or otherwise.

**Post-Confirmation Employment of Personnel**.

The Committee, the Reorganized Company and Plan Agent (the latter subject to an annual cap of $75,000 (subject to increase pursuant to the Plan)) may employ or contract with Persons and other Entities to perform, or advise and assist them in the performance of, their respective obligations under the Plan subject to the cap on WCR. The Reorganized Company, in consultation with and after written approval from the TPL Board, may continue to employ the Debtor's Professionals for the purposes for which they were employed before the Confirmation Date and for such additional purposes as the Reorganized Company may request. The Reorganized Company, in consultation with and after obtaining written approval from the TPL Board, may employ such other Professionals as may be necessary to perform its responsibilities under the Plan.

**Post-Confirmation Compensation and Reimbursement of Professionals**.

Any Professionals employed by the Reorganized Company, the Committee, or the Plan Agent (the latter subject to the annual cap of $75,000 and subject to CEO and TPL Board approval) will be entitled to payment of their reasonable fees and reimbursement of expenses on a monthly basis, subject to the cap on WCR and subject to the procedure set forth at section VII-N of the Plan which is summarized in part as follows:

Each party requesting payment of such compensation must serve a detailed statement of requested fees and expenses on the Notice Parties. Any Notice Party or other party in interest may object to any portion of the requested fees and expenses by serving on the Notice Parties and the party whose compensation is subject to the objection, within fifteen (15) days after service of the detailed statement, a detailed written objection.

If there is no objection to a party's requested fees and expenses within such fifteen (15) day period, the Reorganized Company will promptly pay the requested amount in full. If an objection to a portion of the fees or expenses requested is timely served, the Reorganized Company will pay the undisputed portion.

To the extent that an objection is timely served, the Responsible Person will reserve monies in the amount of the disputed fees and expenses pending resolution of said objection.

Any objection to a request will be resolved by either: (a) written agreement between the requesting party and the objecting party; or (b) the Bankruptcy Court pursuant to a Final Order. Resolution by the Bankruptcy Court shall be requested by motion filed and served on the Notice Parties in accordance with the Bankruptcy Rules and the Local Rules on not less than twenty-one (21) days' notice. Any opposition to the motion shall be filed and served no later than seven (7) days prior to the hearing.

Professionals employed by the Reorganized Company, the Committee or the Plan Agent will not otherwise be required to file applications for Bankruptcy Court approval of post-Confirmation fees and expenses. Following the closing of the Bankruptcy Case, the Professionals of the Reorganized Company, the Committee and the Plan Agent will be entitled to payment in the ordinary course upon the submission of an invoice to the Reorganized Company and subject to written approval by the Committee; provided, however, that any disputes with respect thereto will be resolved by the Bankruptcy Court upon reopening the Bankruptcy Case

**D.** **Notice Procedure.**

The Plan requires a Person to provide notice pursuant to the Notice Procedure before certain action may be executed. The Notice Procedure requires the Person seeking the particular relief to serve a written notice on the Notice Parties. Such Person will be authorized to take the proposed action described in the notice upon the expiration of the period specified in the Plan for such notice unless, before the expiration of the specified notice period, a Notice Party or a party

in interest, has filed an objection to such proposed action with the Bankruptcy Court and scheduled a hearing on such objection within thirty (30) days after the filing of the objection and upon not less than twenty-one (21) days' notice to all Notice Parties. If any such objection is filed, the Person seeking the particular relief will not take the proposed action unless the Bankruptcy Court approves such action or the objecting party withdraws the objection. Service by electronic filing pursuant to Local Rule 9013-3 will be adequate for all notices and other pleadings filed with the Bankruptcy Court.

E. **Post-Confirmation Fees and Reports**.

Not later than thirty (30) days after the end of each calendar quarter after the Effective Date, the Reorganized Company will pay to the United States Trustee the quarterly fee due for such quarter until the Bankruptcy Case is converted or dismissed, or the Bankruptcy Court enters the Final Decree (discussed below).

No later than thirty (30) days after the end of each calendar quarter after the Effective Date, the Reorganized Company will file a quarterly post-Confirmation status report and serve a copy of said report on the Committee, until the entry of the Final Decree, unless otherwise ordered by the Bankruptcy Court.

F. **Final Decree**.

After all motions, contested matters and adversary proceedings have been finally resolved and the Bankruptcy Case is in a condition to be closed, the Reorganized Company will file an application for the entry of a Final Decree to close the Bankruptcy Case. Entry of a Final Decree may be sought by the Reorganized Company notwithstanding that all payments required by the Plan have not been completed; provided, however, that the Bankruptcy Case is determined by the Bankruptcy Court to be fully administered, and provided further, that the Bankruptcy Court retains jurisdiction to hear all matters involving the further administration of the Plan until all holders of Allowed Claims have been paid in full or as otherwise agreed to or provided for under

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 56 of 104

the Plan. The Reorganized Company will serve the application for entry of a Final Decree on the Notice Parties, and such application will be considered by the Bankruptcy Court without a hearing unless within fourteen (14) days after the date of service, a party in interest files and serves a request for hearing.

**G.**     **Executory Contracts**

Confirmation of the Plan, effects the assumption of the following executory contracts: (1) the TPL/Moore/PTSC/PDS agreement dated January 23, 2013; (2) all agreements related to the MMP Portfolio to which TPL is a party, based on the resolution of all controversies existing between (i) PDS, TPL and Patriot and (ii) Alliacense, PDS and Agility IP Law have been resolved; (3) the IP Owners Commercialization Agreements, subject to the agreement of the IP Owners other than PDS to modify the IP Owners Commercialization Agreements to conform with the provisions of the Plan and the waterfall distribution set forth in Exhibit "C" to the Plan and to defer payment of all cure amounts, if any, until payment in full of all Allowed Claims in Classes 1, 3, 4, 5, 6A, 6B and 6C; (4) the Alliacense Services Agreement, as amended by that certain Amended Alliacense Services and Novation Agreement dated July 23, 2014 (the "Novation"), subject to the agreement of Alliacense to defer payment of all cure amounts, if any, until payment in full of all Allowed Claims in Classes 1, 3, 4, 5, 6A, 6B and 6C; (5) agreements between TPL and Thunderbird; and (6) the Debtor's Insurance Policies.

Confirmation of the Plan effects the rejection of the following executory contracts: (a) TPL's Service Agreement with Semiconductor Insights, and (b) the Employee Compensation Contracts.

Article VIII of the Plan may be amended, with appropriate notice to affected parties, at any time prior to the conclusion of the Confirmation Hearing, to add or remove executory contracts and unexpired leases to be assumed and assigned, or rejected; provided, however, that no such amendment will impact the Licenses or Licensees' rights or defenses thereunder.

Case: 13-51589     Doc# 638     Filed: 01/08/15     Entered: 01/08/15 18:00:31     Page 57 of 104

The Reorganized Company will retain the right to reject any Excluded Contracts, but not any Licenses or related commercialization agreements, prior to the Confirmation Hearing. Following written notice to the affected party, the Reorganized Company may reject any Excluded Contracts without further order of the Bankruptcy Court (with the affected party to the Excluded Contract having 30 days after notice of rejection to file a Rejection Claim, if any). Excluded Contracts which have not previously been assumed or rejected by TPL by final Order of the Court are deemed under such circumstances to have "passed through" the bankruptcy and will remain in effect without modification, unless subsequently rejected in accordance with the Plan.

The holder of a Rejection Claim arising from rejection of its contract must file a proof of Claim relative to such Rejection Claim on or before the Rejection Claims Bar Date[17] or be forever barred from asserting any such Claim or receiving any payment or other Distribution on account of such Claim. With respect to any timely filed Rejection Claim, the holder of such Rejection Claim may elect treatment in Class 5 of the Plan by filing such election with the Bankruptcy Court with service on the Reorganized Company and its counsel at the addresses in the caption of the Plan no later than the Rejection Claims Bar Date, unless such date is extended by written agreement of the Reorganized Company.

## H.    Default Under Plan.

The Reorganized Company and Plan Agent shall produce an annual report listing the Reorganized Company's income, expenses, and dividends paid to creditors under the Plan..  The report may be obtained by submitting a written request to the Plan Agent, and shall be available

---

[17] Under the Plan, the Rejection Claims Bar Date is, for non-Excluded Contracts, the earlier of: (a) thirty (30) days following the date of the Notice of Confirmation; or (b) thirty (30) days after the entry of a Final Order prior to Confirmation approving rejection of an executory contract or unexpired lease, and for rejected Excluded Contracts: thirty (30) days from the date notice of rejection and notice of the Rejection Claims Bar Date is provided to the affected party to the Excluded Contract.

solely to any creditor holding an Allowed Claim at the time of the request. The first report shall be produced each year, 30 days after the one-year anniversary of the Effective Date.

If the Reorganized Company defaults in the performance of any of its material obligations under the Plan and does not cure such default within a period of 30 days after receipt of written notice of such alleged default from any affected party in interest, then such party in interest may move the Bankruptcy Court, upon notice to the Notice Parties and after opportunity for a hearing, for an order directing the Reorganized Company to perform such material obligations. If the Reorganized Company fails to perform any such material obligations within 21 days, any party in interest, including, but not limited to, the Office of the United States Trustee, may file a motion with the Court seeking an order converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code. Any party in interest, including the Reorganized Company, may oppose any such motion. If such motion is granted, the executory provisions of the Plan shall terminate excluding Article XIV, and all property of the Reorganized Company will vest in the Chapter 7 estate and will be administered by the chapter 7 trustee as prescribed in Chapter 7 of the Bankruptcy Code. In the event that: the Plan fails because the Effective Date fails to occur by the deadline; the Plan is revoked; the Plan is modified (without the consent of the IP Owners); the Bankruptcy Case is dismissed or converted, or a second voluntary or involuntary case is filed, then the following provisions of the Plan terminate upon the failure of the Plan:

a. The subordination of the Claims of Daniel E. Leckrone and interest related thereto as well as any release provided to Mr. Leckrone under the Plan; Plan IV B, F, G and H;

b. Control of the Debtor by the Committee-appointed CEO and TPL Board instead of the TPL Member appointed Manager; Plan VI B and H; and,

c. The modification under or in connection with the Plan of any IP Owners Commercialization Agreements (as such term is defined in the Plan); Plan VII A; and

In addition, without prejudice due to the passage of the Administrative Claim Bar Date, upon failure of the Plan, the IP Owners may assert Chapter 11 Administrative Claims; provided, however, that all such Claims shall be subordinate to the allowed fees and costs awarded to Estate Professionals for pre- and post-confirmation services rendered.

# VI. <u>DISCLOSURES & ANALYSIS OF TREATMENT OF EXECUTORY CONTRACTS</u>

TPL is currently party to a range of executory contracts, which are being assumed or rejected under the Plan, or which will ride through the bankruptcy having been neither assumed nor rejected. TPL's executory contracts can be divided into the following categories: (1) Commercialization Agreements, pursuant to which TPL is granted rights to commercialize Portfolios based upon a stated set of terms; (2) Settlement Agreements with ongoing obligations; (3) Service Agreements with vendors providing TPL with services, including litigation patent counsel, Alliacense, and others; (4) Employment Compensation Contracts; and (5) Agreements with general business vendors.[18]

## A.     <u>Commercialization Agreements with Historical Background</u>

TPL's Commercialization Agreements are currently the core of its business because these are the agreements pursuant to which TPL has the right to manage Licensing Programs and otherwise commercialize Portfolios. The common thread in all TPL's Commercialization Agreements is that TPL acquires the exclusive right to commercialize the Portfolio patents in

---

[18]  TPL has also entered into approximately 175 non-exclusive licenses of patent portfolios. TPL does not believe that such licenses are executory contracts and subject to either assumption or rejection under the Plan. Inasmuch as rejection would simply trigger the right of the licensees to continue to use the licensed patent under Bankruptcy Code Section 365(n), all such licenses will be deemed to have "ridden through" the Bankruptcy Case and emerge unaffected following Confirmation.

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

Case: 13-51589     Doc# 638     Filed: 01/08/15     Entered: 01/08/15 18:00:31     Page 60 of 104

exchange for an obligation to commercialize and a percentage of the proceeds. The obligation to commercialize typically includes the obligation to prosecute and maintain the patents within the reasonable business judgment of TPL and incur other expenses related to the development of the commercialization program as well as minor administrative costs associated with entity maintenance. TPL has evaluated each Commercialization Program and corresponding Portfolio Commercialization Agreement to determine whether, in its business judgment, each should be assumed. The factors that TPL considered include: (1) whether there are defaults to cure upon assumption of the agreements; (2) whether the agreements are a significant source of revenue for TPL's business operations in the next 5 years; (3) whether the revenues projected over the next 5 years for the portfolio substantially exceeds the projected costs of the program, or whether there is a strategic benefit to retaining the portfolio in question; (4) whether the patent owners will consent to the assumption of the agreements subject to the provision of the Plan.

TPL is actively pursuing Commercialization Programs with respect to the MMP, CORE Flash and Fast Logic Portfolios, including the current litigations pending against infringers of MMP, CORE Flash and Fast Logic. TPL will assume each Commercialization Agreement for the MMP, CORE Flash and Fast Logic Portfolios, and each counterparty of each Commercialization Agreement for the CORE Flash and Fast Logic Portfolios has agreed to consent to such assumption upon Plan confirmation; such consent will only be withheld on grounds that the Plan is not confirmed. TPL has evaluated each of these Commercialization Programs and corresponding Portfolio Commercialization Agreements and has determined that, in its business judgment, each should be assumed because TPL believes there are no defaults to cure on assumption of the agreements; the agreements are currently, or are anticipated to be within 5 years, a significant source of revenue for TPL's business operations; and the revenues projected over the next 5 years of each portfolio substantially exceed the projected costs of the program or there is a strategic benefit to retaining the portfolio in question

The CORE Flash and Fast Logic Portfolios are owned by the IP Owners, limited liability companies that are owned in part indirectly by Dan E. Leckrone. The two IP Owners have received payment since the signing of the Term Sheet of 20% of the CORE Flash and Fast Logic Portfolios licenses negotiated. The IP Owners claim that they have Administrative Claims for amounts owed to them for licenses negotiated after the filing of this Bankruptcy Case but before the Term Sheet was signed in excess of $2 million. Such sums, if any and to the extent Allowed, have been voluntarily subordinated to the payment of all Allowed Claims senior to Class 7 under the Plan. .

TPL has also evaluated each of the other Commercialization Programs and corresponding Commercialization Agreements and has determined that, in its business judgment, each of such other Commercialization Agreements should not be assumed because they failed to meet one or more of the same factors discussed above. TPL believes that there will not be damages claims resulting from the rejection of these agreements.

1. <u>MMP – Charles Moore, Patriot Scientific Corporation  and Phoenix Digital Solutions LLC</u>.

In 2002, Charles Moore approached TPL to consult regarding the development and commercialization of a new microprocessor device known as an "Array" that would be suitable for use as a processing platform for a software enabled radio. The Array would utilize elements of the Moore Microprocessor or "MMP" technology (a de facto standard of fundamental building blocks for virtually all modern microprocessor devices) in which TPL had been involved with Mr. Moore in the 1980's.  TPL formalized the relationship with Mr. Moore in late 2002 in a Commercialization Agreement (the "Moore-TPL ComAg"), pursuant to which Mr. Moore granted TPL an exclusive license to commercialize the MMP Portfolio of patents as well as an assignment of partial ownership in the MMP Portfolio.  The Moore-TPL ComAg is the

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 62 of 104

genesis of TPL's ownership in MMP, one of the key revenue generators for TPL. It was amended in 2007 to reflect a number of additional agreements between the parties.

In early 2004, Patriot Scientific Corporation ("Patriot") filed a lawsuit against TPL, Mr. Leckrone and Mr. Moore for declaratory judgment disputing their ownership in the MMP Portfolio. The litigation was ultimately settled by the parties, and a stipulated final judgment was entered in June 2005 in favor of TPL, Mr. Leckrone and Mr. Moore on their counter-claims declaring that Mr. Moore was a co-inventor and TPL was a co-owner of the MMP Patents. In connection with the settlement, a Master Agreement was entered into by TPL, Mr. Moore and Patriot dated June 7, 2005 pursuant to which a joint venture was created (Phoenix Digital Solutions, LLC or "PDS") with equal ownership split between Patriot and TPL, the MMP Portfolio was transferred into PDS, and TPL was granted exclusive rights with respect to the management and commercialization of the MMP Portfolio under the terms of the Commercialization Agreement entered into amongst Patriot, PDS, and TPL. The PDS Operating Agreement governs the limited liability company and identifies each Member's rights and obligations with respect to the Joint Venture, including TPL's right to proceeds of the MMP Portfolio from PDS.

In addition, Patriot, PDS and TPL entered into a Commercialization Agreement ("PDS-TPL ComAg") granting TPL exclusive rights to commercialize the MMP Portfolio as well as a licensing fee in an amount equal to 15% of the gross proceeds of the MMP licensing program less certain adjustments and the payment of all third-party expenses. A series of conflicts arose over payments owed between the parties under the various agreements, which have resulted in a number of agreements through 2012. The parties agreed to amend the commercialization program in July of 2012 to resolve additional disputes between the parties, the result of which is that PDS licenses the MMP Portfolio instead of TPL and TPL no longer manages the MMP Licensing Program. Thus, the right of TPL to receive a 15% fee for licensing the MMP Portfolio

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 63 of 104

was eliminated, leaving TPL with the exclusive right and authority to pursue litigation involving the enforcement of the MMP Portfolio. PDS contracted directly with Alliacense to manage and license the MMP Portfolio, resulting in the Alliacense Services Agreement.

At the time of the filing of the petition for reorganization, TPL was party to a settlement agreement with Charles Moore, Patriot and PDS resolving litigation regarding payment of royalties claimed by Mr. Moore, in the case of *Moore v. Technology Properties Limited, LLC et al.* Santa Clara County Superior Court, Case No. 1-10-cv-183613. This agreement, entered into on January 23, 2013 (the "January 2013 Settlement Agreement"), provides, among other things, that Mr. Moore is paid a percentage of funds distributed from PDS rather than be paid by TPL from TPL's distribution. It also resulted in Mr. Moore dismissing the action against TPL with prejudice. The payment provisions in the settlement agreement take the place of the prior agreements between TPL and Mr. Moore regarding Mr. Moore's receipt of revenue from the MMP Portfolio. PDS and Patriot agreed to accept the terms, including the obligation of PDS to pay Mr. Moore, and granted him an advisory seat on the board of PDS.

Subsequent to the Petition Date, in order to resolve various disputes between Alliacense, TPL, PDS, and Patriot, the Novation of the Alliacense Services Agreement was executed, which, among other things, divided up potential licenses between Alliacense and a second licensing agent.

The Novation also addressed some $2.2 million in past due payments claims by Alliacense, quarterly advances, Alliacense's role in pending and prospective litigation, and conduct of the MMP licensing program. The Novation provides (1) for a fixed gross percentage fee for a license from the NorCal litigation with HTC; (2) a sliding scale for resolutions in the NorCal litigation, litigation support for contingency counsel; (3) a new schedule for the licensing services fee ranging from 20% to 30% gross depending upon the amount of the license, subject to reduction if settlements resulting in $5 million in license proceeds do not occur for a period of

61 days or more. Critically, the Novation contains a one-year milestone whereunder failure by PDS to achieve a certain level of income from litigation and licensing constitutes a basis for termination of the entire Alliacense Services Agreement upon written notice by PDS.

With regard to prospective litigation, the parties to the Novation agreed that Patriot would identify a second licensing company with which PDS would enter into a commercialization agreement pursuant to which such company will issue licenses to customers. Once identified, Alliacense is to identify all prospective MMP licensing entities, along with other relevant information, divide them into two substantially equal lists from which Patriot and its second licensing company will choose which they intend to pursue, within 30 days. Alliacense will provide its work product and intellectual property with respect to the list selected by the second licensing entity under a nondisclosure agreement in exchange for a 1% fee. TPL and Patriot have agreed to the employment by PDS of Dominion Harbor Group ("DHG") as the second licensing company, subject to certain restrictions as to which matters DHG may review and pursue. TPL understands that Alliacense is in the process of preparing the list of prospective MMP licensing entities but has not yet completed or delivered it. TPL further understands that Patriot contends that the Novation is in breach owing to the failure to deliver the list.

A condition precedent to confirmation of the Plan requires a written agreement(s) resolving all controversies existing among Alliacense, PDS and Agility IP Law (counsel prosecuting litigation of the MMP Portfolio). The parties executed the Novation to resolve all such controversies. Patriot contends that any controversies arising out of the Novation must be resolved prior to and as a condition of Confirmation, and that controversies still exist arising out of obligations under the Novation, including Alliacense's obligation to deliver the lists of prospective licensees to be considered (and associated work product) to PDS. The Committee wishes to emphasize that it will assert failure of this condition to Confirmation if it is not

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 65 of
104

satisfied that the splitting and delivery of lists has been resolved with PDS or arrangements have been made that satisfy the Committee.

TPL will, subject only to Plan approval, assume any and all agreements related to the Joint Venture with Patriot related in any way to the ownership of the MMP Portfolio or the rights to license the MMP Portfolio that are executory contracts. All non-executory contracts and agreements related in any way to the ownership of the MMP Portfolio or the rights to the MMP Portfolio, including rights to license, will pass through the Plan and Bankruptcy Case.

    2.    <u>Commercialization Agreements with Other Unrelated Parties</u>.

        a.    <u>3D ART</u>.

In October of 2009, TPL entered into a commercialization agreement with Adrian Sfarti pursuant to which TPL agreed to implement a commercialization program with respect to a new graphics technology now known as 3D ART, with TPL as the exclusive licensor thereof in return for 50% of the net proceeds of the licensing program, which would deduct all costs incurred in conjunction therewith. TPL would also earn an ownership interest in a limited liability company which would be the owner of the patent portfolio, and the limited liability company would initially be owned by Mr. Sfarti with TPL earning at most a 50% interest thereof based on payments of net proceeds to Mr. Sfarti. Disputes have arisen between TPL and Mr. Sfarti who has withdrawn from the program. This agreement will be rejected.

    3.    <u>Commercialization Agreements with Related Parties</u>.

Early in 2006 TPL and IntellaSys Corporation (both of which were owned by Mr. Leckrone) were heavily engaged in the development of the asynchronous array microprocessor, SEAforth. Mr. Brown, the CEO of IntellaSys, had relationships with two chip businesses (OnSpec Electronics Inc. and Indigita) which had already invested in the development of the chip-business infrastructure and customer base and which Mr. Brown regarded as essential for

the future of IntellaSys. Both OnSpec and Indigita also had patent portfolios which appeared to represent valuable additions to TPL's licensing business and the transactions are discussed in detail below.

The OnSpec and Indigita transactions occasioned the development of a model for the acquisition of patent portfolios which would enable TPL to build, protect, and retain portfolio value at the same time segregating the ownership of each Portfolio so that each could be independently developed and commercialized without the constraints and complications that arise from Portfolio ownership being mixed with other assets and the interests of other principals, a commonly-used structure in the industry.

The structure involved the acquisition of a Portfolio by a dedicated limited liability company, owned indirectly by Mr. Leckrone and his family members, the sole function of which was to acquire ownership of the Portfolio and then to transfer all incidents of ownership other than title to TPL through an exclusive license and assignment of all commercialization and enforcement rights to TPL for its own use and benefit, in exchange for the implementation of a commercialization program by TPL (including the obligation to prosecute and maintain the patents) and a participation in the proceeds thereof. To date, none of the Portfolio owners in this structure has received a payment from TPL. One entity, Interconnect Portfolio LLC, was entitled to a cash payment when the majority of patents of the Portfolio it owned were sold to Samsung (as discussed below), but agreed to delay receipt of its payment until TPL's cash position improved. Interconnect Portfolio LLC filed an unsecured claim of $1,387,375 against TPL. Each acquisition transaction is discussed below.

a.    CORE Flash – MCM Portfolio LLC – OnSpec Electronic, Inc.

In April 2006 Mr. Leckrone acquired OnSpec Electronic, Inc., a chip business that had a well-developed world-wide infrastructure of fab relationships, distribution channels, sales representatives, and a customer base, as a way for the budding IntellaSys business to leverage an

existing structure and launch the SEAforth microprocessor that was being developed by IntellaSys and for which IntellaSys had already forecasted revenues in the hundreds of millions of dollars. It was clear that the SEAforth chip would need an existing platform in order to capitalize on IntellaSys' growth projections. OnSpec also had developed and patented technology related to flash memory management which TPL viewed as a licensing opportunity and ultimately took to market as "CORE Flash."

MCM Portfolio LLC (formerly, FMM Portfolio LLC) was established in early 2006 to acquire the CORE Flash Portfolio from OnSpec. On April 3, 2006, MCM acquired the CORE Flash Portfolio from OnSpec pursuant to a Purchase and Assignment Agreement in exchange for an interest-bearing promissory note in favor of OnSpec from MCM (the "OnSpec Note"), and thereafter MCM granted TPL an exclusive license to CORE Flash in exchange for an obligation to commercialize the Portfolio (including the prosecution and maintenance of the patents) and a percentage of the proceeds. Mr. Leckrone then acquired the outstanding shares of OnSpec and TPL guaranteed the payment of the purchase price (approx. $10 million). This structure was a requirement of the Selling Shareholders of OnSpec who did not want TPL to be the purchaser of their shares directly, but wanted the guarantee from TPL of payment. TPL, MCM and Mr. Leckrone also granted the Selling Shareholders a security interest, which is discussed in Section III above.

The following payments of the purchase price for the outstanding shares of OnSpec have been made to date: $3,847,272 in 2006, $1,716,238 in 2007, $251,104 in 2011 and $625,000 in 2012, for a total of $6,439,614. These payments were booked as distributions by TPL to Mr. Leckrone in TPL's financial records as well as for tax reporting. TPL asserts that rather than writing a check to Mr. Leckrone and then having him write checks to the Selling Shareholders, TPL wrote the checks directly to OnSpec's Selling Shareholders. TPL did not make any of these distributions to Mr. Leckrone at a time when TPL was insolvent. TPL has

never made any payment with respect to the OnSpec Note. TPL has paid $1,050,000 as of June 30, 2014, according to the monthly operating report in adequate protection payments to Mr. Venkidu since the inception of the Chapter 11 to date for the ability to use his cash collateral in operations during this time.

TPL also had a consulting agreement with OnSpec for services related to the development of the licensing and commercialization programs for CORE Flash pursuant to which TPL paid OnSpec $2,400,000 from June 2006 through April 2008.

As a fully-operational chip company with a range of product offerings, the OnSpec infrastructure was leveraged by the IntellaSys business (which merged into TPL in September 2006) by enabling it to establish relationships quickly and on similar terms with fabs, sales representatives and distributors, and potentially customers. The OnSpec workforce also provided substantial technical expertise, which was leveraged by IntellaSys. By early 2008 the OnSpec chip business had been integrated into TPL's IntellaSys division and a small flash drive startup named IronKey Inc. acquired substantially all the remaining assets of OnSpec and hired the OnSpec team of developers in a non-cash transaction that resulted in the issuance to OnSpec of IronKey stock. Upon completion of the transaction with IronKey in April 2008, OnSpec was dissolved in April 2008.

TPL has received licensing revenue of approximately $14 million from the CORE Flash Portfolio to date and will continue to earn revenues from it if MCM Portfolio LLC, the owner of the Portfolio, allows TPL to assume the licenseTPL has incurred nominal administrative expenses per year on MCM's behalf related to entity maintenance and tax preparation pursuant to the TPL-MCM Commercialization Agreement. TPL believes it is in the best interests of the Estate to assume the TPL-MCM Commercialization Agreement. MCM has agreed to allow assumption of the Commercialization Agreement, subject to modifications described in the Plan and immediate reconveyance of all right, title and interest in the CORE

Flash portfolio on account of its license to TPL back to MCM. The purpose of this reassignment is to ensure that, in the event of a conversion of the Bankruptcy Case to Chapter 7, MCM will not be required to seek relief from stay to terminate the license under a commercialization agreement that a trustee could not use to sell licenses and could neither assume nor assign to a third party.

TPL will continue to commercialize and negotiate licenses of CORE Flash patents and technology without change. It will earn precisely the same revenue it does under the current arrangement. The only difference is that MCM will execute license agreements at the direction of TPL. MCM will have no discretion to refuse to do so.

The reassignment of the CORE Flash Portfolio is conditioned upon MCM's subordination of any claims for cure to all Unclassified Claims and Allowed Claims in Classes 1-6C herein without regard to whether the Bankruptcy Case remains in Chapter 11 or is converted to Chapter 7.

b.     TruVNS – VNS Portfolio LLC – Indigita Corporation

In April 2006, Mr. Leckrone established VNS Portfolio LLC for the purpose of acquiring all rights to the TruVNS Portfolio from Indigita Corporation out of bankruptcy, and the acquisition was completed in May 2006 for approximately $30,000. TPL asserts that the amount of the purchase price was booked as a distribution to Mr. Leckrone in TPL's financial records and for tax purposes, but rather than wire the amount to Mr. Leckrone with a subsequent wire to the bankruptcy estate, TPL wired the amount directly to the selling estate. VNS immediately granted TPL the exclusive license to commercialize the Portfolio in exchange for an obligation to commercialize the Portfolio and a percentage of the proceeds. The Indigita chip business had some of the same potential benefits as OnSpec, but was significantly earlier in its development. It was thought, however, that its chip products could help build the IntellaSys brand which in turn would benefit the anticipated SEAforth chip business once it was ready to launch. Indigita

also had promising video networking technology ("TruVNS") which TPL thought could be commercialized.

TPL has not earned significant revenue from the TruVNS Portfolio to date, but continues to market it. No payments have been made by TPL to VNS Portfolio, nor is VNS Portfolio making a claim against the estate, either pre-petition or administrative. TPL has incurred nominal administrative expenses per year on VNS' behalf for entity maintenance and tax preparation pursuant to the TPL-VNS Commercialization Agreement. There have been insignificant expenses in the prosecution of the Portfolio and TruVNS has not been the subject of any litigation nor is it expected to be. TPL does not anticipate the potential revenues from the Portfolio to be significant enough to warrant the continued prosecution and maintenance costs involved and therefore will reject the Commercialization Agreement.

c.    Fast Logic – HSM Portfolio LLC – Thunderbird Technologies Inc.

In May 2007, Mr. Leckrone established HSM Portfolio LLC to acquire certain high-speed memory technology (now known as the Fast Logic Portfolio) from Thunderbird Technologies Inc. in a non-cash transaction. The acquisition was finalized on June 19, 2007 and was based on a revenue sharing formula pursuant to which Thunderbird would receive a specified percentage of Fast Logic licensing proceeds after the payment of certain program expenses. TPL guaranteed the performance of the payment of Thunderbird's percentage to Thunderbird. The acquisition was followed immediately by the grant of an exclusive license to TPL by HSM Portfolio in exchange for the obligation to commercialize and a percentage of the proceeds.

At the same time as the Fast Logic portfolio acquisition transaction, TPL engaged Thunderbird on a consulting basis to continue its development of unrelated technology in return for a right of first refusal with respect to the commercialization thereof. TPL made payments under the Consulting Agreement totaling $990,000. The right of first refusal was not exercised

by TPL when it matured based on TPL's evaluation of the commercial viability of a licensing program based on the technology.

In March 2011, the parties agreed to modified terms of the commercialization program for Fast Logic and then in April 2012 TPL and HSM entered in to an agreement with Thunderbird pursuant to which Thunderbird received $1,250,000 from TPL in exchange for the agreement of Thunderbird to accept that amount as payment in full satisfaction of outstanding unpaid royalties due Thunderbird, the reduction of Thunderbirds' entitlement to a share of future Fast Logic proceeds from 35% to 17.5% and a forbearance agreement for 24 months. TPL has received license revenue in excess of $19 million from the Fast Logic Portfolio to date and continues to earn revenues from it. No amounts are currently owed to Thunderbird. HSM Portfolio does not have a pre-petition or Administrative Claim against TPL in the Chapter 11 proceeding. TPL has incurred nominal administrative expenses per year on HSM's behalf for entity maintenance and tax preparation pursuant to the TPL-HSM Commercialization Agreement. There have been significant expenses in the prosecution of the Portfolio as well as in support of the litigation discussed in Section II.B above; however, the investments made to date are expected to pay off in revenues over the next 5 years and TPL believes it is in the best interests of the Estate to assume the TPL-HSM Commercialization Agreement.

HSM Portfolio has agreed to allow the Debtor to assume the TPL-HSM Commercialization Agreement subject to modifications consistent with the Plan and on the condition that TPL assign all right, title and interest in its license of the Fast Logic portfolio to it. The purpose of this reassignment is to ensure that, in the event of a conversion of the Bankruptcy Case to Chapter 7, HSM will not be required to seek relief from stay to terminate the license under a commercialization agreement that a trustee could not use to sell licenses and could neither assume nor assign to a third party.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 72 of
104

TPL will continue to commercialize and negotiate licenses of Fast Logic patents and technology essentially change. It will earn precisely the same revenue it does under the current arrangement. The only difference is that HSM will execute license agreements at the direction of TPL. HSM will have no discretion to refuse to do so.

The reassignment of the Fast Logic Portfolio is conditioned upon HSM's subordination of any claims for cure to all Unclassified Claims and Allowed Claims in Classes 1-6C herein without regard to whether the Bankruptcy Case remains in Chapter 11 or is converted to Chapter 7.

d.    Chip Scale – Wafer-Level Packaging Portfolio LLC – Schott

In March 2008, Mr. Leckrone established Wafer-Level Packaging Portfolio LLC ("WLP") to acquire certain semiconductor packaging technology now known as the Chip Scale Portfolio from a subsidiary of Schott AG. The acquisition was finalized in July 2008 and is based on a revenue-sharing formula pursuant to which Schott would receive $495,000 plus a percentage of the Chip Scale licensing proceeds after the payment of certain program expenses. The acquisition was followed immediately by the grant of an exclusive license to TPL by WLP Portfolio in exchange for the obligation to commercialize and a percentage of the proceeds.

The $495,000 owed to Schott was not paid until July 2010, and was paid by TPL to ensure TPL retained its rights to license the Portfolio.

TPL incurred expenses in connection with the prosecution of the Chip Scale patents acquired from Schott AG, and a dispute arose regarding the payment of fees to the law firm of Blumbach-Zinngrebe totaling approximately $200,000 which is the basis for the scheduling of the firm as a TPL creditor. It is the position of TPL that all amounts paid to the firm by TPL will be recoverable as program-related expenses under the terms of the revenue-sharing formula. TPL has earned approximately $600,000 in licensing revenue from the Schott Patents to date, but does not believe it has sufficient near-term revenue producing prospects to

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 73 of 104

warrant the continued investment by TPL and therefore should be rejected. No payments have been made by TPL to WLP Portfolio, nor does WLP Portfolio have a pre-petition or administrative claim against TPL in the Chapter 11 proceeding. TPL has incurred nominal administrative expenses per year on WLP's behalf related to entity maintenance and tax preparation pursuant to the TPL-WLP Commercialization Agreement.

TPL also incurred expenses in conjunction with the commercialization of another set of Wafer-Level Packaging patents that were a part of the Chip Scale Portfolio which were owned by a company of the same name, Chipscale, Inc. Mr. Leckrone acquired Chipscale, Inc. in December, 2007 and, concurrently with the transaction, Chipscale, Inc. entered into a Commercialization Agreement with TPL in which TPL was granted an exclusive license to license the portfolio in exchange for a percentage of the proceeds from the commercialization program. Prior to the completion of the acquisition, TPL engaged Chipscale, Inc. (and primarily its principals, Phil Marcoux and Wendell Sander) on a consulting basis to develop a business plan for the commercialization of the Chipscale patents. Disputes arose among the parties. Mr. Leckrone has recently completed a settlement in satisfaction of his and TPL's obligations under the applicable agreements.

e.    Audition – SWAT/ACR Portfolio LLC

In October of 2007, Mr. Leckrone established SWAT/ACR Portfolio LLC ("SWAT/ACR") to acquire and/or develop certain technology related to human hearing. Several acquisitions and development projects were pursued in conjunction with the grant of an exclusive license to TPL by SWAT/ACT in exchange for the obligation to commercialize and a percentage of the proceeds.

The SWAT/ACR patents will require time and expense to maintain and prosecute and there is no near-term revenue forecasted for the Portfolio. TPL has not received any licensing revenue from the SWAT/ACR Portfolio to date, and does not believe it has sufficient

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 74 of 104

near-term revenue producing prospects to warrant the continued investment by TPL and therefore should be rejected. No payments have been made by TPL to SWAT/ACR, nor has SWAT/ACR made a claim against TPL in the Chapter 11 proceeding. TPL has incurred nominal administrative expenses per year on SWAT/ACR's behalf related to entity maintenance and tax preparation pursuant to the TPL-SWAT/ACR Commercialization Agreement.

      f.      Clear Cube – Multipath Portfolio LLC

      Mr. Leckrone established Multipath Portfolio LLC ("Multipath") to acquire certain technology now known as "STRATA" from a subsidiary of Clear Cube Technology Corporation ("ClearCube"). The acquisition was finalized in September 2011 based on a revenue-sharing formula pursuant to which ClearCube would receive a percentage of STRATA licensing proceeds after the payment of certain program expenses. The acquisition was followed immediately by the grant of an exclusive license to TPL by Multipath in exchange for the obligation to commercialize and a percentage of the proceeds.

      The STRATA Portfolio includes patents related to virtual desktop, unified interface, and remote-computing technologies, and are embodied in zero-clients, PC-over-IP Products, and video display monitors. The benefit of this technology is that it reduces the number of cables required to integrate a system.

      TPL intends to reject the Clear Cube Portfolio Commercialization Agreement, however, because it has yet to generate any revenue and is currently the subject of reexamination proceedings rendering the likelihood of revenue being generated within the near term at this stage of the Portfolio's monetization program unlikely. The costs to maintain this program will exceed the likely revenue over the next two years. No payments have been made by TPL to Multipath, nor has Multipath made a claim against TPL in the Chapter 11 proceeding. TPL has incurred nominal administrative expenses per year on Multipath's behalf related to entity maintenance and tax preparation pursuant to the Commercialization Agreement.

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

### g.    Silicon Pipe – Interconnect Portfolio LLC

In March of 2008, Mr. Leckrone established Interconnect Portfolio LLC ("Interconnect") to acquire certain technology now known as "Silicon Pipe" from Novias LLC. The acquisition was finalized shortly thereafter based on a revenue-sharing formula pursuant to which Novias would receive a percentage of Silicon Pipe licensing proceeds after the payment of certain program expenses.  The acquisition was followed immediately by the grant of an exclusive license to TPL by Interconnect in exchange for the obligation to commercialize and a percentage of the proceeds.

The Silicon Pipe Portfolio included high-speed data transfer technology and the major portion of the Portfolio was sold to Samsung in June 2009.  Novias was paid its portion but the amount owing to Interconnect was not paid by TPL and forms the basis of Interconnect's claim against TPL for $1,387,375. The remaining patent has little or no known near-term revenue prospect and, accordingly, the TPL-Interconnect Commercialization Agreement will be rejected.  No payments have been made by TPL to Interconnect, although TPL has incurred nominal administrative expenses per year on Interconnect's behalf related to entity maintenance and tax preparation pursuant to the TPL-Interconnect Commercialization Agreement. Interconnect has agreed to subordinate its claims to the claims of unsecured creditors.

### h.    eCommer$e – Online Security Portfolio LLC

In October of 2008, Mr. Leckrone established Online Security Portfolio LLC ("Online Security") to acquire certain technology now known as "eCommer$e" from James Kuo, an individual.  The acquisition by Online Security was finalized shortly thereafter in a non-cash transaction based on a revenue-sharing formula pursuant to which Mr. Kuo would receive a percentage of eCommer$e licensing proceeds after the payment of certain program expenses. The acquisition was followed immediately by the grant of an exclusive license to TPL by Online Security in exchange for the obligation to commercialize and a percentage of the proceeds.

The Online Security patents will require time and expense to maintain and prosecute and there is no near-term revenue forecasted for the Portfolio. TPL has not received any licensing revenue from the Online Security Portfolio to date, and does not believe it has sufficient near-term revenue producing prospects to warrant the continued investment by TPL and therefore should be rejected. No payments have been made by TPL to Online Security, nor has Online Security made a claim against TPL in the Chapter 11 proceeding. TPL has incurred nominal administrative expenses per year on Online Security's behalf related to entity maintenance and tax preparation pursuant to the TPL-Online Security Commercialization Agreement.

**B.** **Service Agreements Relating to Commercialization**

TPL is a party to the Amended Service Agreement with Alliacense relating to the commercialization of various TPL Portfolios.

**1.** **Amended Services Agreement with Alliacense Limited LLC.**

Alliacense has provided program management services for TPL since its inception in 2005. TPL entered into the Alliacense Services Agreement in 2012. The Joint Plan assumes the Alliacense Services Agreement, subject to Alliacense agreeing to modify the Alliacense Services Agreement to be consistent with the waterfall attached as Exhibit "C" to the Plan. Alliacense has agreed to subordinate claims arising under the Alliacense Services Agreement to the claims of unsecured creditors.

**C.** **Employee Compensation Contracts**

TPL is a party to incentive compensation arrangements with current and former employees and consultants. In June 2004 TPL closed the first licensing transaction involving the MMP Portfolio. TPL then began planning and executing a major licensing program for the MMP Portfolio which would require the assembly of a host of resources including a team of senior Licensing Executives which resulted in the recruitment of two such individuals with

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

broad-based experience in the licensing business (Mac Leckrone and Mike Davis) who joined TPL as consultants in the third quarter of 2004 under compensation packages that paid below-market salaries but included a percentage of TPL licensing revenue as an incentive in lieu of other common compensation elements in Silicon Valley such as stock options. Incentive compensation arrangements were also made with Nick Antonopoulos, TPL's former Senior Vice President of Business Development, Dwayne Hannah, TPL's Chief Financial Officer, Janet Neal, TPL's Senior Vice President of International Administration and Robert Neilson, a former consultant of TPL. Mac Leckrone and Mike Davis became Alliacense employees in early 2007, but their percentage incentive agreements were not assigned to Alliacense, and they remain TPL obligations. Their agreements with TPL were finalized at the time they became TPL consultants, and documented in incomplete consulting agreements which were not signed due to administrative oversight. TPL made initial payments to Mac Leckrone and Mike Davis under their agreements in 2006, but has not made any payments to them since. The agreement with Dwayne Hannah, TPL's CFO, was not documented due to administrative oversight. TPL has not made any payments to Dwayne Hannah pursuant to his incentive compensation agreement. TPL has not made payments to Mr. Antonopoulos, Robert Neilson or Janet Neal with respect to their agreements since 2008. All incentive compensation agreements are rejected under the Plan (although Mr. Neilson's agreement terminated shortly after his departure from the company several years ago). The Plan provides for the Claims of the parties to the rejected Employee Compensation Agreements. (See discussion at Section V.)

///

///

///

///

**D.    Business Vendors**

Under the Plan TPL will assume and reject various other agreements as follows:

| Agreement | Party | Assume/Reject |
|---|---|---|
| Equipment Lease Agreement (copiers) | GE Capital Corporation | Reject |
| Fidelity Investments Retirement Plan Service Agreement for 401k Administration | Fidelity Management Trust Company | Reject |
| Customer Service Agreement establishing the co-employment relationship and administration of payroll and benefits | TriNet Acquisition Corporation | Reject |

TPL has surrendered the copiers to GE Capital, which may file a claim for remaining lease payments based on the rejection of its Equipment Lease Agreement.

TPL has terminated the employment of all but one of its employees (Mr. Leckrone) and through the Plan rejects the contract for the administration of the 401k Plan. No damages from rejection are expected to be asserted.

TPL has terminated its agreement with TriNet, a professional employer organization, which has refunded an amount it had been holding as a deposit. There are no past due amounts currently owing under the TriNet agreement, and TriNet did not file an administrative or pre-petition claim in the Chapter 11 proceeding.

**E .    Agreements Relating to Assignment of TPL Seat On PDS Board of Director To Committee Representative.**

PTSC, Moore, and TPL entered into a Master Agreement in June of 2005 which resulted in a number of transactions and agreements including:

a.    The immediate formation of PDS (f/k/a "P-Newco"), the operation of which is governed by the terms of an Operating Agreement entered into by PTSC and TPL which creates and empowers the PDS Management Committee;

b.     The Commercialization Agreement between PDS, PTSD, and TPL pursuant to which TPL is authorized and empowered to formulate and implement an MMP commercialization program; and,

c.     Agreements between PTSD, TPL, and PDS in July of 2012 resolving a number of differences between the parties with TPL foregoing its exclusive right under The Commercialization Agreement to continue to conduct The MMP Licensing Program, but retaining the exclusive right to operate MMP litigation.

In July 2014, PDS and Alliacense executed an agreement which, among other things, provided for a second licensing agent to commercialize the MMP Portfolio. The Joint Plan provides for the Committee to nominate the TPL representative to the PDS Management Committee. Mr. Venkidu is now serving as the TPL representative on the PDS Management Committee.

## F.     Scope and Intent of Article XIV.

As a means of addressing the Licensee Objectors' concerns and objections, the plan includes XIV. Overriding Protections for Licensee Parties ("Article XIV"). Article XIV is included to effectuate the parties' intent to eliminate any adverse effects or prejudice of the Plan or Confirmation Order on the Licensees' Licenses, claims, rights, interests and defenses. Article XIV will apply comprehensively to preserve all Licensees' rights, licenses, claims, interests and defenses, as described herein, notwithstanding any other provision of the Plan or the Confirmation Order or the operation of the Bankruptcy Code. To the extent any direct or indirect conflict exists between Article XIV and any other provision of the Plan or Confirmation Order, Article XIV will control.

///

///

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

### G.     Confirmation Order.

The Confirmation Order will incorporate and reaffirm Article XIV in its entirety, together with the definitions used herein. Whether or not any IP Owner objects to or supports the Plan, or votes for or against the Plan, the Confirmation Order will prevent such IP Owner from defeating, violating or disputing any of the Licensees' rights, licenses, interests, defenses or other benefits under such parties' respective Licenses or Article XIV.

### H.     Amendments to Article XIV.

Article XIV (and definitions used in the Plan) cannot be amended, modified or otherwise adversely affected, directly or indirectly, from other Plan or Confirmation Order amendments, without the prior written consent of each affected Licensee Objector.

### I.     No Adverse Impact On Licenses.

Notwithstanding any other provision of the Plan or Confirmation Order, the Licenses, and the rights, claims, including offsetting or recoupment claims, interests and defenses of each Licensee thereunder, will ride through this Bankruptcy Case without rejection, prejudice or adverse effects of any kind, including on account of Section 1141. All Licenses will remain in full force and effect, and continue to be valid, binding, and enforceable in accordance with their terms, against TPL, the Reorganized Company, and all applicable IP Owners and their successors and assigns as if there had been no Bankruptcy Case or Plan or Confirmation Order, and neither TPL's reorganization nor exit from bankruptcy will affect such validity and enforceability of the Licenses.

No act or omission of the Committee, TPL, estate representative, other proponent of any confirmed plan of reorganization, or Reorganized Company (such as rejection of or failure to assume any executory contract) changes, impairs, or has the effect of stripping or undermining,

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 81 of 104

whether by Section 1141 or otherwise, any rights, interests, claims, licenses, or defenses under the Licenses that existed before or independent of the Bankruptcy Case, or that were executed prior to the Effective Date. To the extent permissible by otherwise applicable law, the Confirmation Order will estop, enjoin, and bar the Committee, TPL, estate representatives, any other proponent of any confirmed plan of reorganization, and the Reorganized Company, and each of their respective successors and assigns, from taking any action to disrupt or otherwise invalidate or challenge the Licenses and the Licensees' rights, offsetting or recoupment claims, interests, property or defenses thereunder. Nothing in the Plan or in the Confirmation Order will be deemed to restrain, enjoin, stay or otherwise obstruct the enforcement, exercise or defense by any party to a License after the Effective Date of any of their licenses, rights, offsetting or recoupment claims, interests, property or defenses.

### J.   No Change For Patent Actions.

Notwithstanding any other provision of the Plan or the Confirmation Order, the Plan and Confirmation Order will have no effect on any party's rights, claims, including offsetting or recoupment claims, interests and defenses in any patent action or other litigation that has been or may be filed.

### K.   Reserved Objections.

Licensees may defend an attack of their Licenses on any basis, including the protections afforded under Article XIV whether or not previously raised by a Licensee. Furthermore, nothing in the Plan or Confirmation Order will constitute a waiver by any Licensee of such party's rights under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), or *Bellingham Ins. Agency, Inc. v. Arkin (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553 (9th Cir. 2012), or subsequent precedents on this topic, to challenge the jurisdiction of the Bankruptcy Court to issue a final judgment.

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 82 of 104

## L.    IP Owner Side Letters.

The IP Owners have provided written confirmation and consent, in substantially the forms of the side letters attached as **Exhibit "D"** to the Plan, which will be incorporated by reference in the Plan, confirming such IP Owner's promise of non-disturbance of Licensees' rights under their existing Licenses.

## VII.  ALTERNATIVES TO THE PLAN.

### A.    General

TPL and the Committee believe that the Plan provides creditors with the greatest value that can likely be obtained on their respective claims.  The alternative to confirmation of the Plan is liquidation of the Estate under Chapter 7 of the Bankruptcy Code.

### B.    Best Interest of Creditors

The "best interest" test of Bankruptcy Code Section 1129(a)(7)(A)(ii) requires that a plan provide to each dissenting member of each impaired class a recovery that has a present value at least equal to the present value of the distribution that unsecured creditors would receive if the bankruptcy estate were liquidated under Chapter 7 of the Bankruptcy Code.

### C.    Liquidation under Chapter 7

When a Chapter 11 case is converted to a case under Chapter 7 of the Bankruptcy Code, a Chapter 7 trustee is appointed to conduct the affairs of the estate.  In applying the liquidation test of Bankruptcy Code Section 1129(a)(7)(A)(ii), the Bankruptcy Court must consider not only the accrued expenses of administration from the Chapter 11, but the Chapter 7 trustee's fees and expenses, and the fees and expenses of professionals likely to be retained by that trustee. Generally, no distribution is made in a Chapter 7 case until all assets of the Bankruptcy Estate and all claims have been liquidated, a process that can often take many months and sometimes years.  Most importantly, a Chapter 7 trustee does not operate the business over which or she

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 83 of 104

takes control except in very rare circumstances.

TPL's most valuable assets are its commercialization rights in the various patent portfolios pursuant to which it generates revenue, as well as its 50% ownership in the PDS Joint Venture.

The Committee and TPL contend that a Chapter 7 trustee would not be able to generate revenue from the commercialization agreements for the following reasons: first, the commercialization agreements contain exclusive patent licenses, and thus cannot be assumed or assigned in bankruptcy without the licensor's permission. TPL does not believe a trustee would be able to obtain the requisite permission and that such permission cannot be compelled, even if such parties are related parties. Second, even if one or more licensors were to grant such permission, it is unlikely that a Chapter 7 trustee could assume the agreements in any case, for a trustee would not be able to represent that he or she could perform under the agreements by commercializing the portfolios without Alliacense providing services. The likelihood that Alliacense would not cooperate with a Chapter 7 trustee on an interim basis in liquidation is high, particularly if payments under the Amended Services Agreement are not being made. Third, revenue generation from the patent portfolios also depends upon the continued prosecution of the patent litigation. There is not a high likelihood that either Alliacense or the patent-litigation counsel would agree to continue to work for a Chapter 7 trustee. Fourth, the market would be well-informed of any Chapter 7. Potential licensees would have little reason to buy licenses from a Chapter 7 trustee. The much greater likelihood is that infringers would multiply and infringe for years before credible enforcement could ever be brought to bear, if ever, to force settlements.

///

///

///

Without the revenue from the licensing programs for CORE Flash, or Fast Logic, a Chapter 7 trustee's distribution in this case would be limited to the proceeds from the PDS distribution for TPL's ownership in MMP, selling TPL's minimal personal property and, possibly, from some smaller avoidance actions. That analysis follows.

**D.    <u>Liquidation Analysis Applied</u>**

   1.    <u>Assets</u>.

All of the cash in the estate is subject to the liens of CCC, Mr. Venkidu and Mr. Leckrone. Mr. Leckrone's security interest also extends to the personal property of the estate that is not comprised of proceeds from the Patent Portfolios. This personal property, reflected on the schedules, consists of a credit from the Mandarin Oriental Hotel for approximately $26,000, and various office and lab equipment and inventory, scheduled at $44,500.

TPL owns a 50% interest in PDS, which has the exclusive right to license the MMP Portfolio. This interest is also subject to the security interest held by Dan Leckrone. While a Chapter 7 trustee might be able to assign an income interest in PDS, it is unlikely that under Delaware law, anything more is assignable. It is unknown how much would be paid for a partial interest in PDS. The PDS distributions to TPL, or the trustee in the case of a Chapter 7, have value, although the value of the MMP Portfolio may be diminished by the Chapter 7 itself. Because it is difficult to determine what impact, if any, a Chapter 7 liquidation would have on the revenue prospects for MMP, this analysis will assume a marginal impact to what TPL considers MMP's revenue prospects.

TPL also holds causes of action against the Shareholders, Officers and Directors of GreenArrays, Inc. for fraud, conversion and misappropriation of trade secrets being asserted in the TPL/Brown "Roe" litigation. Given the complexity of the action, however, it is unlikely a Chapter 7 trustee would pursue it or that the Defendants would settle quickly.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 85 of 104

2.     Avoidance Actions.

TPL's Statement of Affairs discloses payments to creditors.  It's response to Question 3b, attached hereto as Exhibit "D-2" regarding payments within 90 days to non-insiders, shows a total of $1,693,778.70

The answer to question 3c, regarding payments to insiders within a year, lists total payments to Alliacense of $2,411,921.54 and of $1,547,808.50 to PDS, as set forth in Exhibit "D-3" hereto.

TPL is examining the extent to which all sums were paid within ordinary invoice terms and, if not, the extent to which defenses to an avoidance action might exist under the Bankruptcy Code.

A Chapter 7 trustee (or if the Plan is confirmed, the Creditor Trust Trustee) would examine the offset under the Amended Services Agreement pursuant to which TPL offset approximately $16.3 million of debt owed to Alliacense for unpaid services rendered with a $15 million obligation owed to TPL by Alliacense described herein.  It is possible that the mutual offset of obligations between TPL and Alliacense may be challenged as avoidable under Bankruptcy Code section 553 as an offset with an Insider that was completed within one year of the filing of the case.

Avoidance of the offset may be a fruitless exercise: the transaction was effectuated by an accounting entry and did not involve either the transfer of funds or subsequent payment to Alliacense any different than the manner and amounts to Alliacense made prior to the offset. While the respective obligations of each of TPL and Alliacense could potentially be restored with Alliacense having a general unsecured Class 6A claim, TPL would then be in breach of the Amended Services Agreement.  Collection activity against Alliacense might serve only to force it into a bankruptcy case and further increase administrative expenses.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 86 of 104

TPL asserts that Alliacense does not have cash reserves, or significant assets to sell. It is a service organization whose most valuable asset is its workforce. More importantly, TPL asserts that Alliacense time records for the relevant time period were maintained and TPL believes that those records support the validity of the Alliacense claim and accordingly the offset. The Creditor Trust Trustee will in any event retain the power to investigate and, if appropriate, prosecute any action to avoid or recover the offset.

In addition, a Chapter 7 trustee would evaluate the claims TPL has against PDS and Patriot, including the offset recently asserted by Patriot related to a contingency amount owing to TPL by PDS from a license agreement entered into when TPL still managed the MMP Licensing Program. TPL asserts that PDS has refused to pay TPL $225,000 for a contingency payment on a License that was executed while TPL still managed the Licensing Program and claimed that the amount owing is offset against some amount Patriot claims TPL owes to PDS. TPL asserts that Patriot has not disputed that the $225,000 is owed under the agreement. TPL believes the offset asserted by Patriot is subject to attack because it is done within 90 days of TPL's Chapter 11 filing and no value was given in exchange.

A Chapter 7 trustee may evaluate salaries to insiders as well as the incentive compensation arrangements; however, TPL salaries are within market ranges for similarly-situated employees and no payments have been made with respect to the Incentive Compensation agreements since 2008.

Other historical transactions discussed herein may also be evaluated by a Chapter 7 trustee.

3.    Costs.

The costs of liquidation would include the expenses for administration of the estate such as the disposition of the physical equipment of TPL, payment of professional fees for the Chapter 7 trustee, and payment of the administrative fees from the Chapter 11 case, including the fees for

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 87 of 104

the professionals retained by the Committee. As of September 2014, the total professional fees in the Chapter 11 case, not including the fees of the patent-litigation attorneys, are estimated to approximate $3 million of which $2.5 million had not been paid. TPL has also incurred costs for extensive litigation support and licensing services from Alliacense during the bankruptcy case (which, among other things, has yielded a multi-million license for TPL); Alliacense's possible claim for unpaid Administrative Claims is approximately $400,000 though that will not be asserted as part of the current settlement.

4.    <u>Claims</u>:

The deadline for filing proofs of claim in the case was July 23, 2013. TPL's schedules reflect the following totals:

Secured:    $10,598,844

Priority:    $136,197

Unsecured:    $49,935,308, plus $8,900,421 of non-priority employment claims

| Chapter 11 Plan | Amounts | Chapter 7 Liquidation | Amounts |
|---|---|---|---|
| Projected Available Cash as of February 1, 2015 | $2,100,000 | Projected Available Cash as of February 1, 2015 | $2,100,000 |
| Projected Distribution Under Plan (6 yrs) | $38,000,000 | Other Asset Net Value (6 yrs) | $22,000,000 |
| **TOTAL CHAPTER 11 DISTRIBUTION** | $40,100,000 | TOTAL CHAPTER 7 DISTRIBUTION | $40,100,000 |
| Secured Claims | <$10,600,000> | Secured Claims | <$10,600,000> |
| Projected Chapter 11 Administrative Claims | <$2,500,000> | Projected Chapter 11 Administrative Claims | <$2,500,000> |
| | | Chapter 7 Administrative Claims | <$200,000> |
| Chapter 11 Creditor Trust Trustee | <$80,000> | Chapter 7 Trustee Fee | <$80,000> |
| **ASSETS AVAILABLE FOR DISTRIBUTION UNDER PLAN** | $26,920,000 | **ASSETS AVAILABLE FOR DISTRIBUTION UNDER PLAN** | $10,720,000 |

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 88 of 104

| Unsecured Debt | $20,700,000 | Unsecured Debt | $20,700,000 |
|---|---|---|---|
| Investor Debt | $38,200,000 | Investor Debt | $38,200,000 |
| **PERCENTAGE RECOVERY UNDER PLAN** | 100% of general unsecured, 20% of 13% investor claims if accepted | **PERCENTAGE RECOVERY IN CHAPTER 7** | 18.20% on unsecured claims of $58,900,000, assuming that all claimants in a Chapter 7 case are treated as general unsecured claims. |

The Plan, projected to pay unsecured Allowed Claims 100% of the amount owed plus interest, provides for at least as much to each holder of an Allowed Claim as does the expected 0% recovery, administratively insolvent Chapter 7 liquidation alternative.

## VIII. FEASIBILITY

A.   General

The Bankruptcy Code requires as a condition to the Plan's confirmation that the Bankruptcy Court find that liquidation of TPL or the need for further reorganization is not likely to follow after confirmation.

B.   Strategic Overview

TPL's former management believed that TPL will be able to repay 100% of the allowed claims from secured and unsecured creditors within five to seven years of Plan approval. TPL is currently engaged in monetizing several valuable patent portfolios through licensing and litigation, which when successful, will provide sufficient revenue to pay salaries, professionals and all undisputed secured and unsecured creditors. The Fast Logic Defendants dispute the viability of the Fast Logic Litigation and contend that the litigation will provide no recovery, will expend Estate resources to pay for out-of-pocket expenses of the litigation, and could very likely result in the Estate being responsible for payment of the costs and expenses of Fast Logic Defendants' counsel. If the Fast Logic Defendants are correct, this may impact feasibility of the

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 89 of 104

Plan and creditor recoveries which are, in part, based on assumed recoveries from the Fast Logic Litigation.

TPL's revenues have stagnated since the filing of the Chapter 11 Petition and were on a downward projector since 2010, $10.1million in 2012, $11.3 million in 2011 and $17.6 million in 2010); however, TPL believes that the emergence from bankruptcy, new management and the additions of a second licensing agent for MMP Portfolio will be the impetus for revenues to increase significantly, and return to pre-2009 levels as several of the litigations reach pivotal points. TPL believes that the most recent stagnation is due largely to a "wait-and-see" approach being adopted by infringers who are waiting to see if TPL emerges from Chapter 11. TPL and the Committee have worked diligently together to negotiate and file the joint Plan and this Disclosure Statement. TPL believes that the negative impact to revenue of not having a confirmed Plan will continue until a Plan has been confirmed and an Effective Date set. Once TPL emerges from Chapter 11, however, TPL believes it will continue to reap the benefits of the strategy it undertook in 2011 and revenues will rebound and be sufficient to pay all creditors in full.

TPL's revenue forecast is based upon (i) a review of prospective licensees, scope of infringement and relevant revenue related to infringing products; and (ii) an evaluation of timing of outcomes based on knowledge of historical references, including general factors like typical time between offer, counteroffer and close, as well as specific factors, like historical dealings with individual companies. TPL discounts the results to accommodate various uncertainties and contingencies related to negotiation and litigation.

The focus for TPL going forward until 100% of the allowed claims have been paid will be its efforts to continue to monetize TPL's interest in MMP, CORE Flash, and Fast Logic Patent Portfolios.

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

TPL will from and after Confirmation reduce its annual operating budget to an amount not to exceed $325,000 to cover its limited employee salaries, directors' fees and overhead  Not included in  this  annual budget are litigation costs relating to the attorneys in connection with patent litigation and costs for licensing services paid to Alliacense or its replacement.  The fees paid to these firms are primarily based on existing contingency agreements for a percentage of revenue, or adjusted revenue, plus some hourly litigation support and patent prosecution fees paid to Alliacense.  In addition to fees paid to these third parties, there will be additional fees paid to support the litigation for expert witnesses, document production and storage and trial expenses such as airfare, hotel and meals. The Fast Logic Defendants contend that such continued expenses should be weighed against the probability of success and potential recovery of the Fast Logic Litigation.   The Waterfall attached as Exhibit "C" estimates these expenses at 15% of the gross proceeds of recovery.  Expenses associated with patent maintenance are separately set forth in TPL's annual operating budget.

Certain portfolios have revenue-sharing agreements with third party-inventors such as Fast Logic (Thunderbird Technologies Incorporated).  These are not considered "costs" of TPL as the revenue is not reflected in the income portion of the projection.  Under the Waterfall, these costs will be paid from the proceeds of the recovery.

TPL has reduced its operating costs to a minimum. Upon the Effective Date, TPL will have only one employee – the CEO. The CEO may hire additional employees and incur additional expenses as needed to implement the Plan and approved by the TPL Board Licensing revenue is inherently inconsistent.  Because of this, certain months, or many consecutive months, may generate low revenues. The proposed Plan provides that the Reorganized Company establish a working capital reserve of $500,000 to pay expenses if revenue is not adequate. (See Section V.C., above "Means of Executing the Plan")

///

C.     Assumptions Related to Forecasts.

The following discussion summarizes the key assumptions made in TPL's forecast:

1.     Foundational Assumptions.

a.     The forecast includes and is based upon estimates and predictions which are realistic in terms of the known facts as well as conservative in an effort to avoid triggering expectations regarding possibilities which may or may not become realities regardless of any currently perceived likelihood.

b.     The forecast is limited to revenue proceeds generated by the MMP, CORE Flash and Fast Logic, Portfolios because they are the three TPL Portfolios which are either currently producing revenue or are expected to do so in the near future.

c.     The remedy sought by initiating Litigation in the ITC is the issuance of an Exclusion Order which prohibits the Respondent from continuing to import infringing goods into the United States to the detriment of a domestic industry.  The remedy sought by initiating litigation in a US District Court is the entry of a judgment against the Defendant ordering the payment of damages as well as an injunction.  When both courses are pursued in conjunction with a well-executed and business-oriented licensing program, recalcitrant infringers are incented to purchase a license which will entitle them to use the technology they have incorporated in their products and eliminate their exposure.

d.     Nothing either materially harmful or materially beneficial occurs during the forecast period in conjunction with the TPL licensing and litigation programs planned with respect to the four Portfolios discussed below.

e.     All of the licensing and litigation programs will be impacted similarly over the course of this forecast by the vagaries of economic conditions, legislative activity, and judicial/administrative decisions related to the U.S. Patent System.

f.      Each of the individual licensing and litigation programs will also be impacted over the course of this forecast by events which specifically relate to its respective portfolio patents and the proceedings and transactions in which they are involved, causing each program in each portfolio to be impacted differently from time to time.  Accordingly, the forecasted revenue for each has been allocated and spread differently over the forecast period to reflect the effect of portfolio-specific events which are planned elements of the commercialization strategy being pursued for the specific portfolio.

2.      <u>MMP Assumptions</u>.

a.      As outlined in Section II.B, the MMP Portfolio is currently in litigation in: (i) the ITC against over a dozen U.S. and non-U.S. corporations; (ii) the Northern District of California against the same group of companies; and, (iii) the Northern District of California against HTC.

b.      The forecasts included as Exhibit "B-1" are based on the following MMP-specific facts and assumptions:

The favorable outcome of the HTC litigation will encourage infringers  to license rather than litigate, and the positive Markman ruling from that litigation is deemed determinative in cases that have not settled.  Companies that are not Respondents in the ITC or Defendants in the Northern District are also incented to purchase licenses.  Additional waves of litigation are filed, likely in excess of 30 companies, but no parallel ITC case is filed because an Exclusive Order (exclusive remedy in the ITC) would be nearly moot by the expiration of the patents.  The forecast assumes that costs related to any subsequent litigation effort remain approximately the same, the most significant of which is the litigation counsel contingency arrangement.  The Markman ruling from the NorCal Case is deemed determinative in these additional rounds of litigation.  TPL's forecast assumes half of the remaining MMP revenue comes from litigants, while half is from non-litigants.  Because of the different contingency percentage related to

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

litigants versus non-litigants, TPL's forecast predicts approximately twice the amount of revenue coming from PDS to TPL will be from non-litigants.

Another material assumption TPL made with respect to the MMP revenue included in the forecast is that PDS will continue to be have the rights to license the MMP Portfolio. The Disclosure Statement details the history of the MMP Portfolio as well as the joint venture relationship between Patriot Scientific and TPL and the nature of the rights of PDS with respect to licensing the Portfolio and of TPL with respect to litigation enforcement. The Plan provides for the assumption of all of the related contracts and it is assumed that the agreements will continue uninterrupted. If, on the other hand, PDS were to be dissolved, then TPL and Patriot Scientific would each have the right to license the portfolio unless a different agreement were reached, and that could negatively impact TPL's revenues from the MMP Portfolio. Another material assumption TPL made with respect to MMP revenue is that the licensing program services will be equivalent to the services that have been historically provided by Alliacense. In July 2014, PDS and Alliacense agreed, among other things, that a second licensing company would be hired and split evenly between Alliacense and the second licensing company

   3.   <u>CORE Flash Assumptions</u>.

      a.   As outlined in Section II.B, the CORE Flash Portfolio has been involved in litigation in two separate ITC actions against over two dozen U.S. and non-U.S. corporations, and is in litigation in the Eastern District of Texas against the same companies.

      b.   The forecasts included as Exhibit "B-1" are based on the following CORE Flash-specific facts and assumptions:

         The favorable outcome in the ITC in September 2013 will provide incentive for several Respondents and non-litigants to purchase licenses during the fourth quarter of 2013 and the first quarter of 2014. The stays in the remaining District Court Cases will be lifted in 2014

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 94 of 104

and the District Court litigation will proceed. Those cases are resolved prior to the entry of a final judgment and no further litigation is anticipated if storage devices and technology migrate away from flash memory. While the forecast assumes licenses from litigants generate more revenue, the costs associated with that revenue are also higher.

The most significant assumptions behind the CORE Flash revenue in the forecast, however, are that TPL retains its exclusive right to license and enforce the CORE Flash Portfolio, there are no successful attacks on validity of any asserted patent and that no holder of a security interest in the Core Flash patents forecloses in it (which should not occur as long as the Plan is not in default.) Another significant assumption is that the licensing program services will be equivalent to the services that have been historically provided by Alliacense. If the Reorganized Company chooses to use a different licensing entity, TPL's CORE Flash revenues could be significantly affected.

4.      Fast Logic Assumptions.

a.      As outlined in Section II.B., the Fast Logic Portfolio is currently in litigation in Federal District Court in Delaware against over a dozen U.S. and non-U.S. corporations to recover damages for infringement beginning as early as 2006.

b.      The forecasts included as Exhibit "B-1" are based on the following Fast Logic-specific facts and assumptions:

The Delaware District Court Case is not scheduled to go to trial until 2015 for two of the four remaining defendants, and until 2016 for the other two defendants.[19] It is expected that these cases will be resolved prior to the entry of a final judgment. It is also expected that the

_____

[19] As referenced above, both ST Micro and Toshiba have just settled the cases against them, further enhancing feasibility of the Plan with a substantial cash infusion.

Case: 13-51589    Doc# 638    Filed: 01/08/15    Entered: 01/08/15 18:00:31    Page 95 of
104

Fast Logic licenses purchased by defendants will have an aggregate higher cost than that of licenses purchased by non-litigants. The costs related to non-litigant licenses, however, are lower and therefore yield a better return. The pursuit of additional Fast Logic litigation does not prove to be warranted in light of the expiration of the Fast Logic patents, the high cost of discovery, and the limited exposure of system vendors based on the purchase of Fast Logic licenses by their chip suppliers. TPL's forecast for revenue from Fast Logic assumes no revenue after 2016.

In addition, as with CORE Flash, TPL has assumed it continues to have the right to license the Portfolio and that there are no successful attacks on validity of any asserted patent. It is also assumed that the licensing program services will be equivalent to the services that have been historically provided by Alliacense. If the Reorganized Company chooses to use a different licensing entity, TPL's revenue from CORE Flash could be significantly affected.

     5.    <u>Certain Cost Assumptions</u>.

As stated above, revenue generation is dependent upon the services of an effective licensing program service provider and TPL's forecast assumes Alliacense will continue to provide services on the terms that had been previously agreed. It is also assumed that historical averages for patent prosecution and maintenance can be used to predict future costs, that patent maintenance fees do not materially change and that no portfolio identified above goes through significant reexamination activity at the USPTO.

D.    <u>Other Considerations</u>

     1.    <u>Accounting Basis</u>.

The Forecast utilizes the Accrual Method of Accounting, wherein all Revenues are reported as when earned and all Costs are shown as when incurred. For EBIDTA (Earnings Before Interest, Depreciation, Taxes, and Amortization) TPL assumed that all amounts were

Case: 13-51589   Doc# 638   Filed: 01/08/15   Entered: 01/08/15 18:00:31   Page 96 of 104

received or paid during the current quarters or years of operation shown. TPL assumed a variable percent for income tax on profits for calculating Net Income based on the timing of payments to creditors whose payments will be currently tax deductible (versus certain payments to creditors which were deducted when expensed). The assumed income tax rate is from 22% in the earlier years of the forecast to 48% in the later years.

The Quarterly Payments per the Forecast for 2015-2021 are estimated to total $46.453 million: $8.875 million in 2015, $9.154 million in 2016, $7.028 million in 2017, $6.198 million in 2018, $6.219 million in 2019, $5.037 million in 2020, and $3.942 million in 2021, respectively. Note that this represents the planned distribution to creditors under the Plan.

2.  <u>Summary of TPL's Operating Results Post-Bankruptcy</u>

From the inception of the Chapter 11 reorganization through June 2014, TPL has generated approximately $10.6 million in revenue with expenses totaling $8.5 million, which includes $3.4 million attributable to reorganization expenses such as professional fees and payments to the United States Trustee[20]. Professional fees are expected to dramatically decline after Plan confirmation, and there will be no payments for adequate protection or U.S. Trustee fees after the Plan effective. TPL's latest monthly operating report filed with the Court is attached hereto as Exhibit "E".

3.  <u>Summary of Historical Operations and Revenues</u>

Exhibit "B-2" hereto details TPL's historical revenues dating back to 2006, the costs associated therewith, and the basis upon which TPL contends that the long-term historical view of the licensing potential of its portfolios supports feasibility.

---

[20] Professional fees have continued to accrue and are estimated to total approximately $3 million as of August 30, 2014

4. <u>Risks</u>.

It is important to understand that TPL may not be making the right assumptions to accurately predict future revenues and expenses. In addition, unforeseen variables may significantly impact the forecast causing actual financial results to differ materially. Revenues are difficult to predict for many reasons. Litigation outcomes are inherently unpredictable due to judicial discretion and jury inconsistency. The Fast Logic Defendants also contend that the outcome of the Fast Logic Litigation will be unfavorable in light of the Delaware District Court's Claim Construction Order and its importance in foreshadowing the eventual outcome of the litigation. Outcomes from reexaminations at the USPTO are difficult to predict because there is no pre-determined timeframe for resolution and examiners can differ in their evaluation based on the same facts. It is difficult to predict market changes with respect to products utilizing the technologies; as well as a number of other factors. For example, if an asserted patent is found invalid, revenue possibilities for an entire portfolio may change dramatically. Similarly, a successful reexamination of a patent can increase the revenue possibilities for an entire portfolio significantly. In addition, the Reorganized Company will be operated by new management and the impact of that change on the company's finances cannot be anticipated. TPL's expenses can also be difficult to predict. While certain expense items are relatively controllable and foreseeable, like costs related to employees, others are not, like costs to defend multiple reexamination attacks on a certain critical patent. Reexaminations of patents are typically initiated by infringing companies to delay the ultimate requirement of purchasing a license, or avoid it altogether. This process can be very lengthy and expensive and is hard to predict because it is based on the actions of other companies. In sum, the licensing business is inherently difficult to predict and the assumptions used to prepare the forecast, as well as the forecast itself, should be considered with these risks in mind.

5.     Effective Date Payments

TPL will be required to have cash on the Effective Date equal to (a) the amount of the WCR of $500,000, and the (b) amount that the holder of Allowed Administrative Claims (consisting of Claims of the Debtor's Professionals and the Committee's Professionals) will accept as a down payment on their projected, estimated $2.5 million in fees and costs,[21] (c) unpaid United States Trustee's fees, (d) Class 1 Priority Claims totaling $131,356.76, (e) CCC's Class 2 claim totaling $170,000, and (f) Class 5 Administrative Convenience Claims totaling $45,510.62.   With a projected $2.1 million in cash on hand at the Effective Date, TPL will be able to perform its Effective Date obligations under the Plan.

## IX. **DISCLOSURE OF POST-CONFIRMATION MANAGEMENT**

TPL intends to employ Mr. Venkidu as its CEO who will have the authority, duties and responsibilities set forth in the Plan. [See, e.g., Plan Section VII-B].  Mr. Venkidu will receive an annual salary in an amount to be determined by the TPL Board.

The Committee will appoint a TPL Board for the Reorganized Company which will have the authority, duties and responsibilities set forth in the Plan. [See, e.g., Plan Section VII-B]. The TPL Board is currently comprised of Marcie Brown and David Wright, both of whom are anticipated to continue as members of the TPL Board for the Reorganized Company, subject to their resignation and replacement.  Ms. Brown and Mr. Wright will be paid on an either an hourly or monthly flat fee, subject to a cap, to be agreed with TPL and the Committee.

---

[21]  The balance of fees and costs allowed will be paid over time from the Administrative Claims Contribution**,** the roughly 50% of Adjusted Gross Revenue contributed each quarter to pay holders of Allowed Administrative Claims who agree to accept treatment other than payment in cash in full on the Effective Date.

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

# X.  FEDERAL INCOME TAX CONSEQUENCES OF PLAN FOR CREDITORS

Implementation of the Plan may result in federal income tax consequences to creditors. Tax consequences to a particular creditor may depend on the particular circumstances or facts regarding the claim of the creditor.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.  Rather, the following disclosure is provided for informational purposes only.

The federal tax consequences of the Plan to a hypothetical creditor typical of the holders of claims or interests in this case depend to a large degree on the accounting method adopted by that hypothetical creditor.  A "hypothetical creditor" in this case is defined as a general unsecured creditor. In accordance with federal tax law, a holder of such a claim that uses the accrual method and who has posted its original sale to TPL as income at the time of the product sold or the service provided hypothetically should adjust any net operating loss to reflect the amounts paid by TPL under the Plan provided that holder previously deducted the liability to TPL as a "bad debt" for federal income tax purposes.  Should that holder lack a net operating loss, then in accordance with federal income tax provisions, the holder should treat the dividend paid as ordinary income, again provided the holder previously deducted the liability to TPL as a "bad debt" for federal income tax purposes.  If the accrual basis holder of the claim did not deduct the liability as a "bad debt" for federal income tax purposes, then the amount paid by TPL has no current income tax implication.  A holder of a claim that uses a cash method of accounting would, in accordance with federal income tax laws, treat the amount paid as income at the time of receipt.

///

///

///

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

**TPL MAKES NO REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR. EACH PARTY AFFECTED BY THE PLAN SHOULD CONSULT HER, HIS OR ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO A CLAIM.**

## XI.    CONSIDERATION OF COMPROMISE AS FAIR AND EQUITABLE

Releases provided to the Released Parties under the Plan are being granted as compromises of controversy under which each party voting for the Plan and thereby receiving a release by and through his, her or its vote, subject to the terms of the Plan, subordinates his, her, or its Claims in the Bankruptcy Case to the holders of Allowed Claims in Classes 1 through 6C. TPL requests that the Court consider and approve such releases under Federal Rule of Bankruptcy Procedure 9019.

### A.    Standard For Approval Of Compromises In Bankruptcy

The bankruptcy court has wide discretion to approve settlements. Davis v. Jackson (In re Transcontinental Energy Corp.), 764 F.2d 1296, 1299 (9th Cir. 1985). That discretion is tempered by the principle that the settlement must be fair and equitable in the circumstances for the court to approve it. Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1381 (9th Cir. 1986), cert. denied 107 S.Ct. 189 (1986).

> In determining the fairness, reasonableness and adequacy of a proposed settlement, the court must consider: '(a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of

creditors and a proper deference to their
reasonable views in the premises.'

In re A & C Properties, 784 F.2d at 1381 (quoting In re Flight Securities Litigation, 730 F.2d

1128, 1135 (8th Cir. 1985), cert. denied 105 S.Ct. 1169 (1985).

The court's inquiry on settlement is a limited one:

It is sufficient that, after apprising itself of all
facts necessary for an objective opinion
concerning the claim's validity, the court
determines that either (1) the claim has a
'substantial foundation' and is not 'clearly
invalid as a matter of law', or (2) the outcome of
the claim's litigation is 'doubtful.'

United States v. Alaska National Bank of the North (In re Walsh Construction, Inc.), 669 F.2d

1325, 1328 (9th Cir. 1982)(citations omitted). The bankruptcy court need not conduct a "mini-

trial" on the merits of the disputes to be compromised. Port O'Call Investment Co. v. Blair (In re

Blair), 538 F.2d 849, 851-52 (9th Cir. 1976). "Ample" consideration of the issues in dispute is

sufficient. In re A & C Properties, 784 F.2d at 1381.

## B.    The Proposed Compromise Is Fair And Equitable

### 1.    The Debtor Is At Risk In Litigation.

The Committee believes that it has a strong probability of succeeding in objections to the

Claims of the Released Parties, subordinating those Claims, restricting or removing liens, and

recovering the actual intellectual property now held by the IP Owners. TPL believes that no

actions lay against some of the Released Parties. Both the Committee and TPL agree that there

is a risk that challenges might not succeed, varying by claim and action. Critically, because a

Released Party who votes for the Plan agrees to voluntary subordination in Class 7, thereby

agreeing to receive no payment until the holders of Claims of all non-insiders in Classes 1-6C

TPL DISCLOSURE STATEMENT (JANUARY 8, 2015)

and of unclassfiied Claims, there is no need to engage in litigation of any kind.  This subordination is permanent, as is the release, as to all Released Parties with the exception of Daniel E. Leckrone and the IP Owners even after a conversion to Chapter 7.  On conversion, both the subordination and release as to Daniel E. Leckrone and the IP Owners are undone.

2.    <u>Difficulty Of Collection Is Not A Factor.</u>

Subordination of the Claims of Released Parties does not require collection and, to that extent, this factor is inapplicable.  The ability collect on affirmative claims against the Released Parties is unknown but is not obvious.

3.    <u>Litigation Would Be Unnecessarily Expensive.</u>

The basis for the Plan is the bargain struck between insiders and non-insider creditors is that non-insider creditors get paid first.  Litigating potential misconduct to achieve that which has been agreed is unnecessary by definition. The likely cost of actions against Mr. Leckrone, his relatives, entities in which he has an interest, former employees of TPL, and the IP Owners would undoubtedly cost at least $500,000, and likely more, to prosecute.  It would also require extensive litigation that will result in substantial delay in payments to creditors.

4.    <u>The Creditors' Committee Supports The Settlement.</u>

The compromise is part of the Plan as to which the Committee is a co-proponent.


## XII.  CONCLUSION

This document has been presented for the purpose of enabling you to make an informed judgment to accept or reject the Plan.  You are urged to read the Plan in full and consult with counsel if you have questions.  TPL and the Committee believe that acceptance of the Plan is in the best interest of all creditors, and will provide the best recovery in this case.

Dated: January 8, 2015                    TECHNOLOGY PROPERTIES LIMITED, LLC


                                          By: /s/ Daniel E. Leckrone
                                              DANIEL E. LECKRONE
                                              Its Responsible Corporate Individual


Dated: January 8, 2015                    BINDER & MALTER


                                          By: /s/ Robert G. Harris
                                              ROBERT G. HARRIS
                                              Attorneys for Debtor Technology Properties
                                              Limited, LLC


Dated: January 8, 2015                    DORSEY & WHITNEY, LLP


                                          By: /s/ Robert A. Franklin
                                              Robert A. Franklin
                                              Attorneys for Official
                                              Committee of Unsecured Creditors

Dated: January 8, 2015                    Official Committee of Unsecured Creditors


                                          By: /s/ Marcie Brown
                                              Marcie Brown
                                              Chairperson